WILLIAM ROSS AND HENRY KING, PLAINTIFFS IN ERROR, JAMES S. DUVAL AND OTHERS, DEFENDANTS IN ERROR.

A judgment was obtained in the Circuit Court of the United States for the District of Virginia, in December, 1821, and a writ of fieri facias was issued on this judgment in January, 1822, which was not returned; and no other execution was issued until August, 1836, when a capias ad satisfaciendum was issued against the defendant. Held, that this execution issued illegally, in consequence of the lapse of time between the rendition of the judgment, and the issuing e execution in 1836.

The result of the opinion of the Supreme Court, in the case of Wayman vs. Southard, 10 Wheat. 1, (6 Cond. R. 1.) delivered by Mr. Chief Justice Marshall, was, that the execution laws of Kentucky, having passed subsequent to the process acts, did not apply to executions issued by the Circuit Courts of the United States; and that under the judiciary and process acts, the Courts had power to regulate proceedings or executions. The power of the Court to adopt such rules, was not embraced in the point certified for the decision of the Court, and was not expressly adjudged; but it is the clear result of the argument of the Court.

The Act of the Legislature of Virginia, in 1792, to regulate proceedings on judgments, is substantially and technically a limitation on judgments; and is not, therefore, an act to regulate process. It is a limitation law, and is a rule of property; and under the 34th section of the Judiciary Act, is a rule of decision for the Courts of the United States.

The Act of the Legislature of Virginia, of 1792, limits actions and executions on judgments rendered in the state Courts; and the same rule must be applicable to judgments obtained in the Courts of the United States.

The process Act of Congress, of 1828, was passed shortly after the decision of the Supreme Court of the United States, in the case of Wayman vs. Southard, and the United States Bank vs. Halstead; and was intended as a legislative sanction of the opinions of the Court in those cases. The power given to the Courts of the United States by this act, to make rules as a regulation of proceedings on final process, so as to conform the same to those of state laws on the same subject; extends to future legislation, and as well to the modes of proceeding on executions, as on the forms of writs.

Acts of limitation are of daily cognizance in the Courts of the United States; and in fixing the rights of p ties, they must be regarded as well in the federal as in the state Cou ts.

The rule is well settled, that to avoid a statute, a party must show himself to be within its exceptions.

A declaration in the Circuit Court of the United States for the Virginia district stated the plaintiffs to be " merchants, and partners trading under the firm and by the name and style of Duval & Co., of Philadelphia, in Pennsylvania." This was insufficient to give jurisdiction to the Court in the action; if the exception had been taken by plea, or by writ of error, within the limitation of such writ.

Construction of the Act of limitations of Virginia of 1829. It is a sound principle, that where a statute of limitations prescribes the time within which suit shall be brought, or an act done, and a part of the time has elapsed, effect may be given to the act; and the time yet to run being a reasonable part of the whole time, will be considered the limitation in the mind of the legislature in such cases. This rule is believed to be founded on principle and authority.

IN error to the Circuit Court of the United States for the Eastern District of Virginia.

On the 7th of December, 1821, James S. Duval, Lewis Duval, and John Rheinhart obtained a judgment against William Ross. A writ of fieri facias was issued on the judgment, on the 10th of January, 1822, which was never returned. No other execution was issued on the judgment until the 11th of August, 1836. A capias ad satisfaciendum was then sued out, and executed on the body of Ross, who gave up property in discharge of his body, and entered

[Ross et al. *vs.* Duval et al.]

into a bond with Henry King as surety for the forthcoming of the property, on the day and at the place of sale. This bond was forfeited, and a motion was made upon it for an award of execution—the award of execution was opposed on the ground of the lapse of time between the rendition of the judgment and the award of execution, in August 1836; and it was insisted that the execution had issued illegally, and that the same, as well as the forthcoming bond taken under it, ought to be quashed.

The Circuit Court overruled the motion to quash the execution and the bond; and gave judgment for the plaintiff for the amount of the bond.

The defendants prosecuted this writ of error.

The case was argued by Mr. Robinson for the plaintiffs in error; and by Mr. Nicholas for the defendants.

For the plaintiffs in error, the following points were submitted to the Court:

1. That it having been laid down in Wayman *vs.* Southard, 10 Wheat. 24, that the 14th section of the judiciary act must be understood as giving to the Courts of the Union the power to issue executions on their judgments, and that section declaring that the writs issued shall be agreeable to the principles and usages of law, the Court in determining within what time executions may be issued "agreeable to the principles and usages of law," should adopt the rule of decision prescribed by the 34th section, to wit: the laws of the state in cases where they apply. In this view the Virginia act of 1792 would give the rule; and there being no proof that the persons entitled to the judgment were not within the commonwealth at the time of the judgment being awarded, the second execution, and the forthcoming bond taken under it, should be quashed. Even if there were such proof, it would be of no avail, since the Virginia act of 1826. Sup. to Rev. Code of 1819, p. 260, § 3.

2. That if in determining within what time writs of execution may be issued "agreeable to the principles and usages of law," the Court should resort for a rule of decision to the common law of England; still the second execution must be held to have issued illegally, and the Court should quash that and the bond also: because at common law, though execution had issued within the year, yet unless it were returned and filed, a second execution could not issue after the year.

3. That if the process act be considered as giving the rule, and the inquiry be what was the mode of process used and allowed in Virginia, in this respect, in 1789, still the result must be the same; because the mode of process must either have been according to the common law, or according to the statutes of Virginia. The common law rule has already been stated; and the statutes remaining in force in 1789 will be of no help to the judgment creditors. According to these statutes, no judgment was of force longer than seven years. See reference to them in note to 1 Rev. Code of 1819, p. 489.

[Ross et al. *vs.* Duval et al.]

Mr. Robinson, for the plaintiffs in error, argued—

The proposition maintained in the Court of the United States for the district of Virginia was this: that upon a judgment in that Court, if execution has once issued, though it might never be returned, a second execution might issue afterwards, indefinitely as to time. In other words, that there was no limitation of time within which the issuing of the second execution was confined.

This proposition has been advanced in Virginia for the first time in this cause, and the period at which it is urged is remarkable.

It would not have been very surprising to have heard it a few years ago, when the English Courts, and some of the American, seemed to set at defiance all the statutes of limitation which the wisdom of the legislature had prescribed. But it is remarkable that it should be urged now, when the Courts everywhere, both in England and America, are construing all statutes of limitation according to their plain meaning, and giving to them full effect. When the parliament of England and the state legislatures, to make the limitation more certain, are requiring a written acknowledgment of debt to remove a case from the operation of the statute; when the Courts of Equity, in cases where no statute applies, are enforcing, with almost the regularity and certainty of a statute, the rules adopted by them for repressing antiquated and stale demands; and when the best legal writers of the day are supporting the policy of the statutes, with commendable earnestness and ability.

In a late work, which has added not a little to the reputation of a member of this bench, it is said that "Laws thus limiting suits are founded in the noblest policy; they are statutes of repose, to quiet titles, to suppress frauds, and to supply the deficiency of proofs from the ambiguity and obscurity of transactions. They presume that claims are extinguished, because they are not litigated within the prescribed period. They take away all solid grounds of complaint, because they rest on the negligence or laches of the party himself. They quicken diligence, by making it in some measure equivalent to right. They discourage litigation, by burying in one common receptacle all the accumulations of past times, which are unexplained and have now become inexplicable." This passage is from page 482 of the Conflict of Laws. The author adds, that it has been said by Voet, with singular felicity, that controversies are limited, lest they should be immortal while men are mortal.

Shall I be told that the policy in which statutes limiting actions are founded, does not apply to the limitations of executions after judgment. This surely is not so.

So far from its being the case, we are told by the common law writers, that where execution is not sued out within a year after the judgment, the Court concludes that the judgment is satisfied and extinct; and acts upon this presumption by declining to issue a new execution. 3 Black. Com. 421.

And where execution has issued within the year and never been returned, the presumption of satisfaction is equally strong.

For if it had been put into the hands of an officer, we may reasonably conclude that the creditor would have proceeded against the officer. If he has not proceeded against the officer, the presumption is that the execution had not been delivered to an officer. And his failure to deliver it to an officer, is best accounted for by supposing that the claim had been adjusted between the parties. The common law rule conformed to this reasoning; for it will be presently shown that it placed the creditor who took out execution and never returned it, upon the same footing with him who had taken out none.

The presumptions, then, which lie at the bottom of the statutes limiting actions, are equally applicable to limitations of execution. And if the present decision should be sustained, it will be in opposition to those presumptions, and opposed to the general spirit which now prevails both in legislative bodies and judicial tribunals. This circumstance should induce the Court to look well into the particular case, and see whether the decision is rendered necessary by the Acts of Congress.

It is admitted that every nation must have a right to settle for itself the times within which judicial proceedings may be carried on in its own Courts; and if, indeed, Congress has enacted, that upon a judgment in a Circuit Court of the United States, where execution has once issued, a new execution may issue at any time afterwards; though we may think such an enactment unwise; it must nevertheless be conformed to.

Has Congress so enacted? We certainly can find no such enactment in terms. If there be any such, it is not a direct provision of Congress, but an indirect one.

Has Congress so enacted, directly or indirectly? In the act establishing the judicial Courts of the United States, immediately after specifying the Courts which are established, and their jurisdiction, comes the fourteenth section, which prescribes the means of carrying that jurisdiction into effect.

It declares that "all the before mentioned Courts of the United States shall have power to issue writs of scire facias, habeas corpus, and all other writs not specially provided for by statute, which may be necessary for the exercise of their respective jurisdictions and agreeable to the principles and usages of law." This act was approved the 24th of September, 1789. 1 Story's Law U. S. 59.

The act to regulate processes was approved a few days after, viz. on the 29th of September. It declares that until further provision shall be made, and except where by this act or other statutes of the United States is otherwise provided, the forms of writs and executions, except their style and modes of process, in suits at common law, shall be the same in each state respectively as are now used or allowed in the Supreme Courts of the same. 1 Story's Laws U. S. 67.

The forms of writs, executions, and other processes, and the forms and modes of proceeding in suits, in those of common law, which were used in the Courts in pursuance of the process act of 1789,

were afterwards continued by the process act of 1792; subject however to such alterations and additions as the Courts respectively shall, in their discretion, deem expedient, or to such regulations as the Supreme Court of the United States shall think proper, from time to time, by rule, to prescribe to any circuit or district Court concerning the same. 1 Story's Laws U. S. 257.

The rule which must govern the case is to be deduced from one of these provisions.

On the other side it is contended that the process act of 1789 prescribes the rule in such cases; and that according to that act, after judgment has been obtained in the Circuit Court of the United States for the Virginia district, the mode of process is the same that was used and allowed in Virginia in 1789. In other words, the proposition is that according to the mode of process used and allowed in Virginia in 1789, where execution had issued within the year, though it were not returned, a new execution could issue after the year, indefinitely as to time. Without being at all satisfied that the rule on this subject is properly deduced from the process act, I proceed to show that according to the mode of process used and allowed in Virginia in 1789, where execution had issued within the year, and not returned, a new execution could not issue after the year; but the plaintiff was driven to his scire facias. That this was the mode of process used and allowed in such a case, will be shown both by the common law and by the statutes of Virginia.

It is admitted that according to the common law, where execution was taken out within the year, and a return made showing that it had been ineffectual, a new execution might issue after the year; merely by entering continuances on the roll, so as to preserve the appearance of regularity. Aires *vs.* Hardup, 1 Str. 100. And these continuances were regarded such mere matters of form, that, in many cases, they were allowed to be entered after the issuing of the second writ, if the first appeared to have been returned and filed.

That, however, was indispensable. To sustain the second writ after the year, it was always material to show that the first had been returned and filed. The rule is so laid down by Mr. Tidd in his Practice; and he is sustained by all the authorities. "When," says he, a fieri facias or ca. sa. is taken out within the year and not executed, a new writ of execution may be sued out at any time afterwards, without a scire facias; provided the first writ be returned and filed, and continuances entered from the time of issuing it." Tidd, 1155.

In another place the rule is laid down even more emphatically. After a year and a day from the time of signing judgment, the plaintiff cannot regularly take out execution without reviving the judgment by scire facias; unless an execution was previously sued out, returned, and filed." Tidd, 1031, 1032. See also 2 Saund. 72 c.

A leading authority in support of the rule as here laid down is

the case of Blayer vs. Baldwin, 2 Wils. 82 ; reported also in Barnes, 213.

In Blayer vs. Baldwin execution was sued out within the year, but was not returned. It was, however, continued upon the roll down, by vice comes non misit breve, and a ca. sa. afterwards issued, under which the defendant was taken. The objection was made that the judgment was above a year old, and that there was no return of the execution to warrant the entry of the continuances on the roll. Held: that it was irregular to continue an execution on the roll which was never returned or filed. And on this ground the defendant was discharged out of custody.

Judge Washington decided the same way in the case of Azcarati vs. Fitzsimmons, 3 Wash. 134.

It is plain then, that in this case the execution issued illegally. The plaintiff was driven to his scire facias in like manner as if no execution had issued within the year. And not even the scire facias could have been obtained from the clerk, as the execution was here. After so great a lapse of time as existed in this case, a motion in Court would have been proper even for a scire facias. Lowe vs. Robins, 1 Brod. and Bingh. 381. 5 Eng. Com. Law Rep. 127.

If the execution could not legally have issued according to the common law, the next inquiry is, whether the common law rule was altered by any statute of Virginia remaining in force in 1789. It will be found that the only statutes on the subject, which existed prior to that time, limited the creditor even more than the common law.

By the statute of March, 1657, 1658, no judgment, or any other engagement of debt, was of any force or recoverable five years after the date thereof; with this proviso only, that if the debtor absent himself and depart the country, then during such his departure, it shall not be reckoned nor accounted any part of the five years. 1 Hen. Stat. at Large, 483; 484.

By the act of 1660–61, the time was made seven years, with a similar proviso, that if the debtor should depart the country, the time of his absence should not be esteemed any part of the seven years. 2 Hen. Stat. at Large, 22.

This was soon after the restoration of Charles II. In the succeeding year there was a revisal of the laws; and it was again enacted, that no judgme. should be of force seven years after the grant thereof: with a proviso, that if the debtor depart the country and leave no attorney to answer for him, or in any other way conceal or privily remove himself into any part of the country, such time of his absence shall not be accounted any part of the seven years. 2 Hen. Stat. at Large, 104, 105.

This law, in some of its parts, being supposed to admit of doubt, in 1696 it was repealed, and a new statute passed, declaring that no judgment shall be of force longer than seven years after the date of the judgment, or after the same has been renewed by scire facias; with a proviso, that if the debtor privately depart the country or the

county where he resided and dwelt, or contracted the debt, and have not a sufficient estate in the county where he resided or contracted the debt, or where the judgment was obtained to satisfy the same, it should remain and be in force and recoverable notwithstanding the seven years be expired and past. 3 Hen. Stat. at Large, 146. These different statutes are referred to in a note to the Code of 1819, vol. i. p. 489; in which the reviser notices that there is no exception in favour of absent creditors, or persons under disabilities.

It is highly probable that it was the circumstance of the Virginia statutes operating against creditors residing in England more strongly than the common law did, that led to the subsequent action of the crown.

In the same volume (iii. p. 377) there is a statute of 1705, similar to that of 1696; and in the margin it is stated to have been repealed by proclamation, April 15th, 1830. I have not been able to find this proclamation. If only the statute of 1705 was repealed, and the others remained in force, they would of course have operated to bar this judgment. If, however, all the Virginia statutes on the subject were repealed by the crown, then the matter was left as it stood at common law; and we have seen that, according to the common law, the execution could not legally have issued.

Having shown that the execution could not legally have issued according to the mode of process allowed by the laws of Virginia in 1789, the appellee can derive no aid from the process act; except by making out that the mode of process actually used in Virginia in 1789 was different from what the law allowed; and justified the issuing the execution in this case. No one recollects that such was the case; for the recollection of neither judge nor counsel extends further back than 1792.

The sole foundation for such an idea arises out of the language of the act of 1792. 1 R. C. of 1819, p. 489, § 5. Now, before commenting upon that act, let us sum up, in a few words, the state of things upon which that act was designed to operate.

On the 3d of July, 1776, the Convention of Virginia adopted as a rule of decision, not only the common law of England, but all statutes or acts of Parliament made in aid of the common law, prior to the 4th year of James I., which were of a general nature, not local to that kingdom. 1 R. C. of 1819, p. 135. Of course the statute of Westm. 2d was adopted, which gave the writ of scire facias where the judgment was more than a year old.

Hence, in Virginia, from 1776 to 1792, when execution had not issued within the year, the party was not driven to the action of debt after the year; but had a scire facias, in some cases, when the time was short, on application to the clerk; in others, where the time was longer, on motion.

The act of limitations of 1792 passed on the 19th of December in that year. The clause in question was not reported by the revisers, but was introduced while the bill was in progress through the legis

lature. If, therefore, it did not show an exact acquaintance with the state of the law at the time, it would not be at all remarkable; but in truth the act is very easily explained.

The rule under the statute of Westm. 2d was, that if the judgment be under seven years, the plaintiff might sue out a scire facias as a matter of course, without any rule or motion. After seven years, the writ was obtained by motion, the nature of which varied according as the time was more or less.

The object of the legislature seems to have been to adopt one uniform rule, where no execution had issued within the year; that is to say, to allow a scire facias, as matter of course, without motion, not only seven, but ten years; and not to allow it after ten years, either with or without motion. This is the manifest effect of the first part of the clause : " Judgments in any Court of record within this commonwealth, where execution hath not issued, may be revived by scire facias, or an action of debt brought thereon, within ten years next after the date of such judgment, and not after."

If the clause had stopped here, the case where execution hath issued and no return is made thereon, would have remained as at common law. The party could get no new execution after the year without a scire facias ; but he could, by means of scire facias, get a new execution after more than ten years. The object of the legislature seems in this case also to have been to adopt a uniform rule where execution had issued, and no return was made thereon, to allow other executions to issue, without a scire facias, for the term of ten years ; but not to allow any new execution, even with a scire facias, after ten years. The language of the clause is, "Where execution hath issued and no return is made thereon, the party in whose favour the same was issued, shall and may obtain other executions for the term of ten years from the date of such judgment, and not after."

The exposition given of the law and practice before the statute of 1792, is sustained in the case of Fleming's executor *vs.* Dunlop, 4 Leigh. 338, by Judge Brooke ; the oldest judge of the Court, and the one most familiar with the state of things before 1792. See his opinion, p. 342. It is also sustained by the opinion of the President, p. 343, 344, 345.

Judge Carr, one of the judges, thinks the legislature must have considered the law to be different. He does not himself say the law was different. And the counsel on the other side will attempt to sustain the judgment of the Court below, upon these remarks of Judge Carr—remarks made in a case in which the Court has decided that the statute of 1792 has so far curtailed the common law, that where no return is made, the party cannot obtain a second execution after ten years, even with a scire facias. Here are the remarks of one judge opposed to the opinion of two—and remarks of that judge showing that his opinion of what the law actually was before 1792, coincided with the opinions of his brethren ; and that he merely supposed the legislature to have been under a mistaken impression

as to the law. But if this impression of Judge Carr could be regarded as correct, which it cannot be, it does not prove that the second execution in this case was sanctioned by the mode of process used or allowed in Virginia in 1789. For the opinion of the legislature as to what the law was, does not prove that the law was really so. Still less does it prove that the mode of process used was not according to law.

There can be no difficulty then in concluding that the mode of process used and allowed in Virginia in 1789, did not authorize the issue of the execution in this case; and the appellee, therefore, can derive no aid from the process act, if that act were applicable to the case.

But does it apply? The provisions of the process act, and of the 14th section of the judiciary act, were examined in the cases of Wayman vs. Southard, 10 Wheat. 1; and The Bank of the United States vs. Halstead, ibid. 51.

The Court then said that the form of the writ of execution, and the rule for the conduct of the officer while obeying its mandate, were regulated by the process act, but that the power to issue executions was given by the 14th section of the judiciary act. See pages 23 and 24. The Court then has power to issue executions "agreeable to the principles and usages of law."

These laws control the process in respect to every thing that calls for consideration before it emanates. They control the time at which it may issue. If at the time the execution is applied for, it cannot issue "agreeable to the principles and usages of law," then it must not be issued.

But what law is that whose principles and usages are to give the rule?

In the case of Robinson vs. Campbell, 3 Wheat. 222, the Court was called upon to interpret the meaning of the act of Congress which speaks of the principles, rules, and usages which belong to Courts of equity, as contradistinguished from Courts of common law; and the Court then thought that to effectuate the purposes of the legislature, the remedies in the Courts of the United States were to be at common law or on equity; not according to the practice of state Courts, but according to the principles of common law and equity, as distinguished and defined in that country from which we derive our knowledge of those principles.

So here, in determining what the legislature mean when they say that executions are to be issued agreeable to the principles and usages of law, the Court may feel bound to say that they are to be issued agreeable to the principles and usages of the common law If so, there is an end of the matter: for it has already been shown that, agreeably to the principles and usages of the common law, the execution issued illegally in this case.

It may be said that "agreeable to the principles and usages of law" means agreeably to the principles and usages of the law of

E 2

that state in which judgment is rendered; but that the Court is confined to the law of Virginia in 1789, when the judiciary act passed. If so, the case is equally plain; for it has already been shown that according to the law of Virginia of 1789, the execution issued illegally. But Congress, after it has in the 14th section given writs agreeable to the principles and usages of law, goes on to declare in the 34th section of the same statute, that "the laws of the several states, except when the Constitution, treaties or statutes of the United States shall otherwise require or provide, shall be regarded as rules of decision in trials at common law, in the Courts of the United States, in cases where they apply; and this 34th section is unquestionably prospective as well as retrospective. It regards future as well as existing laws." In this respect the Virginia act of 1792 would govern the case; and the terms of that act are too plain to admit of question. 1 R. C. of 1819, p. 489, § 5.

There is no proof that the plaintiffs were not within the commonwealth at the time of the judgment being awarded. The allegation that they were merchants of Philadelphia at the time of bringing the original action, or at the time of filing the declaration, if evidence of any thing, is certainly not evidence that they were out of the commonwealth when the judgment was rendered. The plaintiffs who seek benefit from the proviso, must prove such a case as is necessary to bring themselves within it. Independently of which, by the Virginia act of March, 1826, the saving is repealed, after ten years from the date of that act. Sup. to R. Code, pp. 260, 261.

But neither the act of 1792, nor the subsequent act, can be looked to except under the influence of the 34th section: and that section, we are told, only furnishes a rule to guide the Court in the formation of its judgment. Grant it. Do we not want a rule to guide the Court in forming its judgment on the forthcoming bond; in deciding whether that bond was taken under an execution which issued legally? And is it not one thing to resort to the state laws to ascertain whether the execution may lawfully issue, and another to resort to the process act to ascertain what should be the proceedings under the execution? To one we look for a rule which is decisive of the rights of parties: to the other we look for a rule as to remedies merely. If an action be brought upon a bond, note, or account, and it would be barred by the law of the state in which the suit is brought, it will be equally barred in a federal Court. Why should not the like rule prevail in regard to judgments? Why should it not be the rule that if a judgment of the same date, upon which like proceedings had been had, would be barred in the state Court, the judgment of the federal Court shall be barred also? That which is evidence, under the state laws, of a particular fact, has been decided by this Court to be evidence of the same fact in a suit in a federal Court. If under the state laws, the circumstances of an execution having issued and no return made thereon is evidence of satisfaction or release; why should it not be evidence of the same

thing in a federal Court? The case of M'Neil vs. Holbrook, 12 Peters, 84, in which the Chief Justice delivered the opinion at the last term, may be cited in support of this view.

In the view which has been presented, full effect has been given to the decision in Wayman vs. Southard, as to the mode of proceedings under execution. But it is proper to mention that, since Wayman vs. Southard, an act of Congress has passed, by which not only writs of execution, but the proceedings thereupon, are to be the same as are used in the Courts of the state. Act approved May 19, 1828. Sess. Acts, 1827–8, p. 57, § 3.

Mr. Nicholas, for the defendants in error, contended,

1. That according to the decisions of this Court, the proceedings on executions in the Courts of the United States, in suits at common law, are to be the same in each state respectively, as were used in the Supreme Court of the same in September, 1789; subject to such alterations as the said Courts of the United States may make, or as the Supreme Court shall prescribe to the other Courts.

2. That the statute of Virginia, passed in 1792, limiting to ten years the right to sue out subsequent executions, where one had issued and not been returned, has no application to executions issued from the federal Courts in that state; and even though it had such application, the defendants in error are within the saving provided for persons not within the commonwealth at the time of such judgment being awarded: nor has the benefit of that saving been taken away by any subsequent statute.

3. That according to the modes of proceeding used and allowed in Virginia in 1789, if an execution had issued within the year, though not returned, there was no limitation as to time upon the right of the party in whose favour it had issued, to obtain other executions; and there is no rule of the Circuit Court of the United States for the eastern district of Virginia, or of the Supreme Court, prescribing a different practice—That, consequently, the second execution in this case was lawfully issued; and the motion to quash the said execution and the forthcoming bond taken under it, was properly overruled.

He argued, that the case of Wayman vs. Southard, in Wheaton's Reports, had decided the case. There the main question was, whether the statutes of Kentucky concerning executions which required that the plaintiff should endorse on the execution, that the notes of particular banks of the state should be received in payment, and on his refusal to allow the defendant to execute a replevy bond, which would stay the execution for two years, applied to executions in the Courts of the United States. This Court decided, that proceedings on executions, according to the forms of the state Courts, were good in the federal Courts, under the process acts of September 29, 1780, and modified by the act of May 8, 1792. The first of these acts, 1 Story's Laws U. S. 67, provides that the forms of writs and executions in the Courts of the United States, and

the modes of proceeding in suits at common law, should be the same in each of the states, respectively, as then prevailed in the Supreme Court of the same. The second act, that of 1792, 1 Story's Laws of the United States, 258, subjected the process authorized by the act of 1789, to such modifications as the Circuit Courts of the United States might make, or the Supreme Court of the United States might prescribe.

The Supreme Court of the United States, considering these two acts as regulating the process in the Courts of the United States, that Court held that no statutes of the state of Kentucky, passed after the enactment of these laws, were applicable to executions issued out of the Courts of the United States.

It was contended by counsel in that case, that the whole application of the process laws of the United States was to the forms of execution and other process, and that these acts did not regulate the proceedings under them, and that the expression, "modes of proceeding," in the act of 1792, applied to proceedings in the Circuit Courts, in contradistinction to "mesne" and "final" process. It was also contended, that the 34th section of the judiciary act of 1789, making state laws rules of decision when they apply, furnished the rule of decision in that case. These positions were negatived by the Chief Justice in the opinion of the Court delivered by him. The Court also decided, that the laws of the states were, by the act of 1789, to be guides for the judgment of the Court in forming its opinion; but not for carrying into effect that judgment. Proceedings after the judgment were merely ministerial. "Trials at common law," included litigation during the pendency of the controversy, and did not extend to process upon judgments. The case of M'Cluney *vs.* Silliman, 3 Peters, 270, shows that state statutes of limitation furnish rules of decision in trials at common law, but does not conflict with the principles settled in Wayman *vs.* Southard. The case of M'Neil *vs.* Holbrook, has reference to a rule of evidence on the trial of a cause—cited also Bank of the United States *vs.* Halstead, 11 Wheat. 51. Boyle *vs.* Zacharie x Turner, 6 Peters, 648. These cases establish the first point in the case of the defendant in error.

The second proposition follows as a corollary from the first; for if the modes of proceeding were in force in 1789, the statutes passed since have no application. The proposition of the counsel for the plaintiffs in error, going to show that the statutes of 1792 should regulate the proceedings upon execution from the Courts of the United States, are founded upon principles expressly repudiated and overruled in the cases of Wayman *vs.* Southard; the Bank of the United States *vs.* Halstead; and Zacharie & Turner; which decide that the 34 section of the judiciary act is a rule of decision and not of proceedings.

Another, and also a fundamental objection to the argument is submitted. In his first point, the plaintiff's counsel proceeds on the hypothesis, that the 14th section of the judiciary act, upon which

the authority to issue executions rests, according to the decisions of this Court, not only gives the power, but also fixes the principle; and furnishes a rule by which proceedings should be governed. Now, the whole object of the 14th section of the act was to prescribe the nature and character of writs, and to declare that those not specially provided for, should be agreeable to the principles and usages of law. There is no reference to proceedings with respect to time, or any thing else.

All the deductions, therefore, that this section was intended, as is supposed and contended for by the counsel for the plaintiffs in error, to fix the rule to govern executions, must fall; and it, therefore, is unnecessary to examine the views he has taken in regard to the usages of the common law.

But even if the act of 1792 applied, the defendants in error are within the saving provisions of that law in favour of persons out of the commonwealth of Virginia, at the time of the rendition of the judgment. The declaration shows that the plaintiffs in the Circuit Court were citizens of another state; and as such, only, could institute a suit in the federal Court. Prima facie, therefore, they were out of the state when the judgment was obtained; and the plaintiffs in error have not shown, as they ought to have shown, that they came into the state within five years afterwards, and before the execution issued. Nor is this saving taken away by the act of 1826.

As to the third point.—What proceedings were in practice, and use, and were allowed in Virginia, in 1789? The opinions of the Judges of the Circuit Court, and of the counsel attending the Court, show that from 1792; no practice different from that claimed by the counsel for the defendants existed after 1792: cited on this point, Fleming vs. Dunlap, 4 Leigh's Reports, 338, the opinion of Judge Carr; 2 Tucker's Black. Com. 333, and a note of cases on that page. 1 Henning Statutes, 177. 179, 180. The act of 1789, and 3 Henning Statutes, 377.

The process act of 1792 provides, that the modes of proceeding should be the same as were then used in the Courts of the United States, in pursuance of the act of 1789. Now, suppose the ancient law of Virginia, of 1696, applied to executions; the counsel for the plaintiffs in error, should show that the limitation of seven years existed by that law in 1792: whereas the opinion of the Circuit Court, and the act of 1792, show that no such limitations existed in practice in the state Courts, even as far back as 1792; nor is there any evidence of its existence in the Circuit Court of the United States for the Virginia district.

Mr. Justice M'LEAN delivered the opinion of the Court.

This suit is brought before the Court, by writ of error, from the Circuit Court for the eastern district of Virginia.

On the 7th December, 1821, James S. Duval, Lewis Duval, and John Reinhart, obtained a judgment in the Circuit Court against

William Ross. A writ of fieri facias issued on the judgment the 10th January, 1822, which was delivered to the attorney for the plaintiffs, and never returned. No other execution was issued until the 11th August, 1836. A capias ad satisfaciendum was then sued out and executed on the body of Ross; who gave up property in discharge of his body, and entered into bond with Henry King, as surety for the delivery of the property on the day and at the place of sale.

This bond being forfeited, a motion was made upon it, under the practice established in Virginia, for an award of execution. The motion was opposed, and the lapse of time between the rendition of the judgment and the execution of August, 1836, was relied on to show that the execution had been illegally issued; and, consequently, that the forthcoming bond was unauthorized and void. But the Court entered up a judgment on the bond. To revise this judgment this writ of error is prosecuted.

In the investigation of the questions which arise in this case, it becomes necessary to refer to certain acts of Congress, and also to certain statutes of Virginia.

By "an act to regulate processes in the Courts of the United States," passed in 1789, it is provided; that until further provision shall be made, and except where, by this act or other statutes of the United States, is otherwise provided, the forms of writs and executions, except their style and modes of process in the Circuit and District Courts, in suits at common law, shall be the same in each state respectively as are now used or allowed in the Supreme Courts of the same."

And by the act of May, 1792, it is declared, " that the forms of writs, executions, and other processes, except their style, and the forms and modes of proceeding in suits, in those of common law, shall be the same as are now used in the said Courts respectively, in pursuance of the act above recited."

These acts adopt the execution laws of the states, as they stood in 1789. An act was passed in 1793, and also one in 1800, on the same subject; but as none of their provisions bear upon the present case, it is unnecessary to examine them.

In 1792 the state of Virginia passed a statute providing that "judgments in any Court of record within the commonwealth, where execution hath not issued, may be revived by scire facias, or an action of debt brought thereon, within ten years next after the date of such judgment, and not after; or where execution hath issued, and no return is made thereon, the party in whose favour the same was issued, shall and may obtain other executions, or move against any sheriff or other officer, &c. for the term of ten years from the date of such judgment, and not after."

There is a saving in this statute in behalf of infants, &c. and persons beyond the commonwealth; giving five years, after the removal of the disability, to proceed on the judgment.

In the argument of this case, in the Circuit Court, as appears from

the bill-of-exceptions, it was stated by the judges, and admitted by the counsel on both sides, that so far back as the recollection of the said judges and counsel extends, it has been the usage in the county and corporation Courts, and in the superior Courts of law, and in the general Court of Virginia, where execution has issued, upon a judgment, and no return made thereon, to allow other executions to be issued. But this recollection of the practice of the judges and counsel did not extend farther back than the above recited statute of 1792.

The Circuit Court, however, held that under the statutes and practice of Virginia, prior to the act of 1792, where an execution had been issued within the year, on a judgment, though not returned, the plaintiff was entitled to issue other executions without restriction as to time. And this is the ground taken by the counsel for the defendant in error.

A reference is made to the early statutes of Virginia which regulated executions, and also to the rule of the common law. And it is contended that the Virginia act of 1792, having passed subsequent to the taking effect of the process acts above cited, cannot affect the proceedings on the judgment of 1821. That the acts of 1789 and of 1792, which adopted the execution laws of the respective states as they stood in 1789, regulate the proceedings on the above judgment, unaffected by any subsequent legislation, either state or federal. And the decision of this Court in the case of Wayman vs. Southard, 10 Wheat. 1, is referred to as fully sustaining this position.

The great question in that case was, whether "the laws of Kentucky respecting executions, passed subsequent to the process act, were applicable to executions which issued on judgments rendered by the federal Courts."

In the very elaborate opinion which was delivered by the late chief justice, a construction was given to the process acts, and to the various sections of the act to establish judicial Courts, of 1789. And in order fully to comprehend the effect of this decision, the points adjudicated will be stated.

The Court decided that the thirty-fourth section of the judicial act, which provides " that the laws of the several states shall be regarded as rules of decision in trials at common law, in Courts of the United States, in cases where they apply," "has no application to the practice of the Court, or to the conduct of its officer, in the service of an execution."

They held that "so far as the process acts adopt the state laws, as regulating the modes of proceeding in suits at common law, including executions," &c. the adoption is confined to those laws in force in September, 1789. That the system, as it then stood, was adopted; subject, however, to such alterations and additions as the said Courts respectively shall, in their discretion, deem expedient; or to such regulations as the Supreme Court of the United States shall think proper, from time to time, by rule, to prescribe to any Circuit or District Court concerning the same.

The Court also held " that the fourteenth section of the judiciary act gave to the Courts of the United States, respectively, a power to issue executions on their judgments." Other sections in the same act are referred to and construed, but they have no direct relation to the case under consideration.

The result of this opinion was, that the execution laws of Kentucky having passed subsequent to the process acts, did not apply to executions issued by the Circuit Court of the United States; and that under the judiciary and process acts, the Courts had power to adopt rules to regulate proceedings on executions. The power of the Court to adopt such rules, was not embraced in the point certified for the decision of the Court, and was not expressly adjudged; but it is the clear result of the argument of the Court.

Having stated the points decided in this opinion, it is only necessary to apply such of them as are applicable to the case under consideration.

There is no evidence in the record that the Circuit Court of Virginia ever adopted any rule, which by a fair construction, could regulate executions. In this view, then, the case must stand upon the execution law of Virginia in 1789, adopted by the process acts. And under the decision in the above case of Wayman *vs.* Southard, it is clear that no subsequent changes in the process law of the state of Virginia, can be obligatory on the Circuit Court.

And here the question arises, whether the Virginia act of 1792, having been passed subsequent to 1789, can have any effect in the present case.

So far as this act can be held to regulate executions, it is clearly inapplicable under the process acts of 1789 and 1792, to the Circuit Court. But the act is substantially and technically a limitation on judgments. It is not, therefore, an act to regulate process. Executions are named in the act, and are authorised to be issued under certain circumstances, within a limited time : but this is only another mode of limiting the judgment; and is strictly and technically as much a limitation on the judgment, as is imposed in the first part of the same section in reference to a scire facias or action of debt. The act provides, that after the lapse of ten years from the rendition of a judgment, where no execution has been issued, neither an action of debt, nor a scire facias shall be brought on it. And that where an execution has been issued and not returned, other executions and proceedings may be had within the ten years; but not afterwards.

If this, then, be a limitation law, it is a rule of property; and under the 34th section of the judiciary act, is a rule of decision for the Courts of the United States.

As an act of limitation, it is impossible to distinguish this from other acts which limit the time of bringing certain actions, either by a designation of the ground or the form of the action.

These acts are of daily cognizance in the Courts of the United States; and no one has ever doubted, that in fixing the rights of

parties, they must be regarded as well in the federal as in the state Courts.

The original judgment in the case under consideration was entered in 1821; and although an exec ion was issued within the year, which was never returned, yet n other proceedings were had on the judgment until the execution of 1836.   Here was a lapse of fifteen years; and if the statute apply, the plaintiffs were barred, unless they can bring themselves within the exception. And why does not this statute apply to the federal Courts.   It limits actions and executions on judgments rendered in the state Courts; and the same rule must be applicable to judgments obtained in the Courts of the United States.

In this view of the case, it is not necessary to look into the Virginia execution law of 1789, to ascertain whether, if an execution was issued on a judgment, within the year, and not returned, the plaintiff might issue other executions, without limitation.   It is enough to know that the act of 1792, imposes a limitation to actions and executions on judgments, which like all other limitation laws of the states, must be enforced by the federal Courts.

After the lapse of ten years, under this statute, a judgment becomes inoperative.   An action of debt will not lie upon it, nor can it be revived by a scire facias.   Much less can an execution be issued on it.   Its vitality is gone, beyond the reach of legal renovation.

In giving effect to this statute, no principle is impugned, which is laid down in the case of Wayman vs. Southard.   The state law, which the Court in that case held not to apply in the federal Courts, was a law that regulated proceedings on executions.   It was a process act, and not an act of limitations.

Do the plaintiffs in this case bring themselves within the saving of the statute.   The rule is well settled, that to avoid the statute, a party must show himself to be within its exception.

No proof is offered to show that the plaintiffs in the Circuit Court were without the commonwealth of Virginia.   The statement in the declaration is relied on to establish this fact.   This statement does not aver that the plaintiffs were citizens of Pennsylvania; but represents them as "merchants and partners, trading under the firm and by the name and style of Duval & Co., of Philadelphia, in Pennsylvania."

This was insufficient to give jurisdiction to the Court, in the original action; if the exception had been taken by plea, or by writ of error within the limitation of such writ.

In 1821, the plaintiffs represent themselves to be of Philadelphia, in Pennsylvania; but does it follow that since that period they have not been within the commonwealth of Virginia?   Does the legal inference arise that they were not within the state when the judgment was entered?   We think not.   Indeed there is no allegation of citizenship by the plaintiffs in the declaration.   For aught that appears on the face of the record, the plaintiffs might have

Vol. XIII.—F

been citizens of Virginia, and residents at the time of the rendition of the judgment.

The act of limitations of 1826, has been referred to in the argument; and it is proper to give a construction to it.

The first section of that act bars all actions founded upon bonds executed by executors, administrators, guardians, &c., and other persons in a fiduciary character; which shall not be commenced within ten years after the cause of action shall have accrued.

The third section repeals the saving of the act of 1792; and the fourth section provides, that "in computing the time within which rights of entry and of action then existing, shall be barred by the provisions of the act of 1826, the computation shall commence from the date of the passage of that act, and not before."

Now, the question arises, what actions are barred by this act? The answer is, all actions founded on bonds, given in a fiduciary character, as described in the first section. The statute does not embrace any action founded on a judgment, or on any other ground, except on a bond of the character above stated.

The saving clause of the act of 1792, as to non-residents, is repealed; the only effect of which is, to bring within the limitation of the statute of 1792, those who were within its saving clause, and against whom the statute had not begun to run. Against such persons the statute could not begin to operate, until the repeal of the exception by the act of 1826.

If the plaintiffs in the Circuit Court had brought an action of debt, or issued a scire facias on the original judgment, or issued an execution, (an execution having been issued within the year of the rendition of the judgment, but not returned,) within ten years from the passage of the act of 1826, they would not have been barred; if they could have shown that up to the passage of that act, they were within the saving of the act of 1792. But failing to do this, as they have failed in the present case, the action on the judgment and the execution would have been barred, at the expiration of ten years from its rendition, under the act of 1792. In the repeal of the saving clause of this act, by the act of 1826, executions are not named as within the saving, but only "the right or title to any action or entry accrued;" and a doubt has been suggested whether a person within the saving clause of the act of 1792, might not claim the right still to issue executions on a judgment on which no action of debt or scire facias could be sustained. We think that it was the intention of the legislature to repeal the saving clause of the act of 1792, as to non-residents, in all its parts; although the language of the repealing clause does not include the term execution. It cannot be supposed that the legislature would bar an action on a judgment, and still authorise an execution to be issued on it.

There is another view of this case, which, though not much considered in the argument, is deemed important by the Court.

And this arises under the process act of 1828. The third section

of this act provides, "that writs of execution and other final process issued on judgments and decrees, rendered in any of the Courts of the United States, and the proceedings thereupon shall be the same, except their style, in each state, respectively, as are now used in the Courts of such state :" " Provided, however, that it shall be in the power of the Courts, if they see fit in their discretion, by rules of Court, so far to alter the final process in said Courts, as to conform the same to any change which may be adopted by the legislature of the respective states for the state Courts."

This act adopts, in specific terms, the execution laws of the state; and if the limitation law of 1792 could be considered, so far as its provisions embrace executions, a process act, this act of 1828 adopts it; and the plaintiffs in the original judgment were bound to conform to its provisions.

To this it is objected, that the Courts of Virginia have uniformly construed the act of 1792, as not affecting judgments entered before its passage; and that as the law of 1828 adopts this statute, by the same rule of construction, it cannot operate on judgments rendered prior to that time. The answer to this argument is, in the first place, if the act of 1792, or any part of it is to be considered as a process act merely, and not an act of limitations, the act of 1828 makes it the law of Congress for the state of Virginia, and gives immediate effect to it. If it be viewed as an act of limitations merely, and not for the regulation of process, it then takes effect, as before remarked, as a rule of property; and is a rule of decision in the Courts of the United States, under the 34th section of the judiciary act. In either case, effect is given to the act of 1792, and it is decisive of the present controversy.

But if it be considered, as contended, an act of limitations adopted by the act of 1828; the answer is, that the Court are to give a construction to the act of 1828. If this act be clear in its provisions, we are bound to give effect to it, although it may, to some extent, vary the construction of the act of 1792. And this is no violation of the rule that this Court will regard the settled construction of a state statute as a rule of decision. For in this case the construction of the state law, in regard to the effect it shall have, is controlled by the paramount law of Congress.

The words are, " that writs of execution and other final process issued on judgments and decrees rendered ;" not on judgments and decrees hereafter rendered. The law provides for executions, not judgments. And it operates on all executions issued subsequent to its passage, without reference to the time when the judgment was rendered.

The judgment in the Circuit Court was entered in 1821, so that seven years of the ten years' limitation of the act of 1792 had run when it was adopted by the act of 1828. Now the question is, shall no effect be given to this act of Congress in Virginia on judgments before its passage, because of the construction by the Virginia Courts of the act of 1792 ?

[Ross et al. *vs.* Duval et al.]

It must be recollected that this act of 1828 is a national law, and was intended to operate in the national Courts in every state. As it regards some of the states, it may, at first, have operated less beneficially in them than in others. But its provisions took immediate effect in all the states.

It is a sound principle, that where a statute of limitations prescribes the time within which suit shall be brought or an act done, and a part of the time has elapsed, effect may be given to the act; and the time yet to run, being a reasonable part of the whole time, will be considered the limitation in the mind of the legislature, in such cases.

There may be some seemingly contradictory decisions on this point, in some of the states, which have been influenced by local considerations, and the peculiar language or policy of certain acts of limitations. But the rule is believed to be founded on principle and authority.

The act of 1828 was passed shortly after the decision of the cases of Wayman *vs.* Southard, and the United States Bank *vs.* Halsted; and was intended as a legislative sanction to the opinions of the Court in those cases.

This act is more explicit than the previous acts on the same subject, as to the power of the Courts of the United States to adopt rules to regulate final process. And it is well remarked, by Mr. Justice Story, in giving the opinion of the Court in the case of Beers and others *vs.* Haughton, 9 Peters, 363; that under this law " the Circuit Court had authority to make such a rule, as a regulation of the proceedings upon final process, so as to conform the same to those of the state laws on the same subject." And this power to adopt rules, so as to conform to the state laws, extends to the future legislation of the states; and as well to the modes of proceeding on executions, as to the forms of the writs.

From the above considerations the Court are of opinion, whether the proceedings in the Circuit Court, in issuing the execution and giving a judgment on the forthcoming bond, be considered as regulated by the process acts of 1789 and 1792, or by the process act of 1828; there is error in the judgment, and that it must be reversed.

This cause came on to be heard on the transcript of the record from the Circuit Court of the United States for the eastern district of Virginia, and was argued by counsel. On consideration whereof, it is ordered and adjudged by this Court, that the judgment of the said Circuit Court in this cause be, and the same is hereby, reversed with costs; and that this cause be, and the same is hereby, remanded to the said Circuit Court, for further proceedings to be had therein, in conformity to law and justice and the opinion of this Court.