Nov. Term,
1848.

SIMPSON
v.
NILES.

*A. M. Crane*, for the defendant.

---

## SIMPSON *v.* NILES.

The process act of congress, (1828,) adopted, for the Federal Courts in this state, the state laws then in force governing executions issuing from the Supreme Court. Therefore, the judgments of the U. S. Circuit Court are liens upon the real estate of judgment-defendants throughout the state.

The vendor's estate in land, contracted to be sold but not conveyed when a portion of the purchase-money is unpaid and more than a mere trust to convey remains, is subject to the lien of judgments obtained against such vendor by third parties.

*Friday,*
*December 1.*

ERROR to the *Fulton* Circuit Court.

SMITH, J.—This was a suit in chancery. The bill alleges that, on the 6th of *March*, 1837, *Niles*, the complainant, purchased from *William Polke*, certain lands in *Fulton* county, for which he, at that time, paid the full amount of the consideration money, and received a bond for a deed. Also, that, in the year 1834, a tract of land in *Marshall* county, was entered at the land office of the United States in the name of *Polke* with the money of *Niles*. It is alleged that, partly through negligence, and partly because the complainant desired to sell the land, and, to avoid expense and inconvenience, intended to have had deeds made to the purchasers directly from *Polke*, he took no conveyance from the latter until the 3d of *May*,

1839, when *Polke* and wife executed to him a deed for the tracts above mentioned.

The bill then further states, that, on the 9th of *March*, 1837, *Niles* agreed to purchase *Polke's* interest in another tract of land in *Marshall* county, called the *Plymouth* tract, for 2,000 dollars, one fourth of which sum was paid at the time, and for the balance three notes were given, for 500 dollars each, payable in twelve, eighteen, and twenty-four months respectively; and that a title-bond was received, conditioned for the execution of a deed upon the payment of the notes. *Niles* alleges that he paid the notes as they became due, and that, on the 3d of *May*, 1839, *Polke* and wife executed to him a deed for this last mentioned tract also; but that, in consequence of a mistake or misdescription in this deed, a second deed for the same property was executed on the 13th of *August*, 1839.

The bill then alleges that, on the 20th of *November*, 1838, *Simpson*, the defendant, recovered a judgment in the Circuit Court of the *United States*, for this District, against one *Lasselle* for 2,760 dollars; that, on the 28th of *December*, 1838, *Polke*, with others, executed a replevin-bond to stay execution on the judgment, which bond was taken by the marshal, and was returned, with an execution which had been issued, and filed in the clerk's office, on the 1st of *April*, 1839; that after the stay on the judgment had expired, another execution was issued and levied on part of the lands above mentioned, conveyed to *Niles* by *Polke;* and that the defendant, *Simpson*, threatened and intended to levy on all said lands, &c. The bill prays for a decree perpetually enjoining the defendant, *Simpson*, from levying on said lands, and to quiet the title of the complainant, &c.

*Simpson's* answer denies any knowledge or notice whatever of the claims of the complainant on said lands, and charges that they are fraudulent and void as against the lien of his judgment. He alleges that *Lasselle* has no property sufficient to satisfy his debt, and insists that the claims of *Niles* ought not to interfere with his lien.

Several depositions were read, but the only fact proved by them which we shall notice for the purposes of the present inquiry is, that the last payment of 500 dollars for the *Plymouth* tract, which fell due on the 9th of *March*, 1839, was not paid at that time, nor until sometime about the month of *October* following, so that both the deeds described in the bill of complaint were executed by *Polke* and wife to *Niles* before that payment was actually made.

The Court below found the material allegations of the bill to be true, and rendered a decree according to the prayer of the complainant.

It is understood that the only point contended for by the plaintiff in error is, that the decree should have required *Niles* to pay to *Simpson*, as a judgment-creditor of *Polke*, that portion of the purchase money for the *Plymouth* tract, which remained due at the time the replevin-bond was executed, as the condition or terms upon which the relief prayed for should have been granted.

To determine the question thus raised, it is necessary to inquire what is the effect of a judgment obtained against the vendor of land, after the date of the contract of sale, and before that of the conveyance of the land to the purchaser, a part of the purchase-money having been paid before the rendition of the judgment.

In *England* it appears to have been uniformly considered that, though a contract for sale is, as between the vendor and purchaser, a conversion of the realty into personalty, yet that judgments obtained against the vendor subsequent to the date of the contract are liens, of which, say the writers upon conveyancing, it is incumbent on the vendor to procure a discharge by release or satisfaction for the security of the purchaser, so far as any part of the purchase-money may remain unpaid after the judgment and notice thereof. Atk. on Tit. 585.— 1 Sugd. on Vend. 613. Equity would relieve the purchaser against judgments entered subsequently to the contract, to the extent that he had paid his purchase-money, if he had not taken a conveyance, or had taken one which was defective. 1 P. Wms. 278. — Finch's R. 28. But

we can find no authority going so far as to say, that such relief would be granted when the lien of the judgments attached before payment of the purchase-money.

The principle upon which relief is afforded to purchasers, when the legal title remains in the vendor, and the land is consequently, at law, subject to execution upon judgments against the latter, seems to be, that the purchaser has as good an equity as the judgment-creditor, and prior in point of time, having honestly paid his money before the land became subject to the judgment-lien. But this principle pre-supposes that the land *is* subject to execution and to the lien of judgments against the vendor, and it is manifest that the purchaser has no such prior equity if the purchase-money was not paid before the lien of the judgment attached. In that case he would not have been bound to pay the purchase-money to the vendor; he might have retraced his steps and rescinded the contract if the vendor refused to procure a release or satisfaction of the judgment; or if a part of the purchase-money had been paid previous to the rendition of the judgment, he might have applied the portion remaining unpaid to the extinguishment of the lien thus created. *Buell* v. *Tate*, 7 Blackf. 55.—*Park* v. *Johnson*, 11 Wend. 450.—4 Mad. Ch. R. 508, n. If, instead of doing so, he voluntarily paid the money to the debtor, he certainly cannot claim any precedent equity as against the judgment-creditor for the value of the payment thus made.

In *Finch* v. *The Earl of Winchelsea*, 1 P. Wms. 277, the earl agreed with the countess dowager, that, in case she would surrender her estate for life in certain premises to him, he having the remainder in tail, in order to enable him to mortgage part of the premises, he would settle the residue of the premises, together with the equity of redemption on himself for life, &c., remainders over, under which the plaintiff claimed. The countess dowager, accordingly, made her conditional surrender; the earl suffered a recovery, made the mortgage, and died without settling the premises according to the agreement. He

was indebted at his death by judgment. The persons on whom the remainders were to be settled brought their bill to have the agreement executed, and the question was whether the agreement bound the land so as to prevent the lien of the judgment-creditors. The only point decided was, that the agreement did not bar the judgment-creditors, because *the consideration was inadequate*, the lord chancellor Cowper saying: "Articles made for a valuable consideration, and *the money paid*, will, in equity, bind the estate, and prevail against any judgment-creditor *mesne* betwixt the articles and the conveyance; but this must be when the consideration is somewhat adequate to the thing purchased." This case is cited in *Hurst* v. *Hurst*, 2 Wash. C. C. 69, and in *The matter of Howe and wife*, 1 Paige's Ch. R. 125, and in both these, the *dictum* of the lord chancellor, that an agreement for a valuable consideration, and *the money paid*, will bind the estate against subsequent judgments *mesne* the conveyance, is noticed and approved, but neither of them go any further. In *Forth* v. *The Duke of Norfolk*, 4 Madd. R. 503, the plaintiff was a judgment-creditor claiming a lien for a balance of purchase-money, part having been paid before notice of the judgment. It was determined there was no lien, because the debtor, when the purchaser received notice of the judgment, had no estate which the judgment would affect. He had previously conveyed to the purchaser. But it is inferable from the remarks of Sir *T. Leach*, that, if notice of the judgment had been given previous to the conveyance, the purchaser would have been held equally affected by the judgment-debt as the debtor himself to the extent of the unpaid purchase money.

In this country there have been but few cases bearing directly upon the point under consideration. In *Pennsylvania*, however, it has been expressly decided, that a judgment against a vendor who has contracted to sell, but has not received the whole purchase-money, is a lien on the vendor's interest; and that a purchaser, under such judgment, will be entitled to the unpaid purchase-

money, and will be bound to make a deed to the vendee according to the original agreement, standing in the place of the vendor. *Fosholt* v. *Reed*, 16 Serg. & Rawle, 267. In *Parks* v. *Johnson*, 11 Wend. 442–448, the question whether a judgment was a legal lien upon the vendor's interest in real estate, when there had been a prior contract of sale and part of the purchase-money remained unpaid, though not directly involved in the consideration of the case, was alluded to by the chancellor, and the opinion was distinctly expressed that it was. It was, however, decided in this case, that a conveyance of the legal title to the vendee, in pursuance of an original contract, does not operate, by relation, back to a time when the vendee was not entitled to a deed by the terms of such contract, so as to divest the lien of an intermediate judgment against the vendor. This was also decided in *Butts* v. *Chinn*, 4 T. T. Marsh. 641, where the purchaser at a sheriff's sale recovered in ejectment, on the ground that a conveyance from the vendor, executed after the lien of the judgment attached, although in pursuance of a previous contract, was, at law, overreached by the subsequent sale under the judgment.

All these cases, therefore, concur in this, that an agreement or contract for the sale of real estate, does not, of itself, free the land from the lien of judgments against the vendor. It is the payment of the purchase-money pursuant to such contract which raises the equity of the purchaser, and entitles him to relief in chancery, and we think it is deducible, not only from these cases but from general principles, that, upon an application to set aside the legal lien of a judgment-creditor attaching after the contract has been entered into, such equity must be measured by the amount of the payment made before the lien attached, and that such lien, so far as it holds an estate of the vendor subject to execution, cannot be divested in favor of the purchaser to enable the vendor to convey to him, free from the incumbrance of such judgment, on the ground of payments made afterwards.

Holding, then, as we do, that the vendor's interest in

Nov. Term, 1848.

SIMPSON v. NILES.

land contracted to be sold but not conveyed, and when a portion of the purchase-money is unpaid and more than a mere naked trust to convey remains, is subject to the lien of judgments obtained against such vendor by third parties, it remains to inquire whether the replevin-bond executed by *Polke*, at the time and in the manner stated in the bill of complaint, was, in effect, a judgment, which, under the laws of this state, became a lien on his interest in the premises in question.

By the R. S. of 1831, p. 240, s. 14, which were in force at the time this replevin-bond was executed, it was provided that all such bonds should have, from the date of their execution, the force and effect of judgments confessed in a Court of record against the person or persons executing the same and against their estates, and that execution might issue thereon accordingly. The replevin-bond executed in this case, must, therefore, be considered as equivalent to a judgment of the Circuit Court of the *United States* within the district comprising this state, and the only subject of inquiry which presents any difficulty is, whether such judgment becomes a lien, from the date of its rendition, upon land situated in counties other than that in which the judgment was rendered.

The precise point now under consideration was decided by the Circuit Court of the *United States* in the case of *Doe ex dem. Shrew and Winter* v. *Jones*, 2 McLean, 78, in which it was held that judgments of that Court are liens upon the real estate of the judgment-defendants throughout the state. This decision is, certainly, entitled to much respect, but as the question does not appear to have been regarded by the profession as definitely settled, and as it is one of much importance in various points of view, we have thought it necessary to make a careful examination of the statutes and decisions bearing upon it.

An act of congress, passed in 1789, declared, that, until further provision should be made, the forms of writs and executions, and modes of proceedings in the Circuit and District Courts of the *United States*, in suits at common

law, should be the same as were then used in the Supreme Courts of the states respectively. This act, it was said, in *Wayman* v. *Southard*, 10 Wheat. 27, is plainly confined to form, but that form, in this particular, had in it much of substance, because it consisted of the language of the writ which specified precisely what the officer was to do. A permanent act of congress upon this subject was passed in 1792, which provided: " that the forms of writs, executions, and other process, except their style, and the forms and modes of proceedings in suits in those of common law, shall be the same as are now used in the said Courts respectively, in pursuance of the act, entitled ' An act to regulate processes in the Courts of the *United States*,' (that of 1789,) except so far as may have been provided for by the act to establish the judicial Courts of the *United States;* subject, however, to such alterations and additions as the said Courts respectively shall, in their discretion, deem expedient; or to such regulations as the Supreme Court of the *United States* shall think proper, from time to time, by rule, to prescribe to any Circuit or District Court concerning the same." This act, it was held in *Wayman* v. *Southard*, adopted the state laws upon the subject of executions as they stood in 1789, and not as they might afterwards be made; and it was further held that a state law regulating executions, passed since that time, is not applicable to executions upon judgments rendered by the *United States* Courts, unless expressly adopted by rules of those Courts.

The next and only other act of congress bearing upon this question, is the act to further regulate processes in the Courts of the *United States*, passed *May* 19th, 1828; the first section of which act adopted, in those states admitted into the Union since the 29th of *September*, 1789, for the Courts of the *United States* in those states, except *Louisiana*, the forms of *mesne* process used at that time in the highest Courts of each of those states; and the third section provided that " writs of execution and other final process issued on judgments and decrees rendered in any of the Courts of the *United States*, and the proceedings

thereupon, shall be the same, except their style, in each state respectively, as are now (*May* 19, 1828,) used in the Courts of such state," reserving to the *United States* Courts power, "by rules of Court so far to alter final process in said Courts as to conform the same to any change which may be adopted by the legislatures of the respective states for the state Courts."

In the *United States Bank* v. *Halstead*, 10 Wheat. 64, the decision above referred to in *Wayman* v. *Southard* was reiterated, and it was held "that the Circuit Court had authority to alter the form of the process of execution so as to extend to real as well as personal property, when, by the laws of *Kentucky*, lands were made subject to like process from the state Courts;" but that an act of the general assembly of *Kentucky*, passed since the act of congress of 1789, which prohibited the sale of property taken in execution for less than three-fourths of its appraised value, did not apply to executions issued by the Circuit Court of the *United States* for the district of *Kentucky*.

In *Ross* v. *Duvall*, 13 Peters, 45, it is said by the Court, that the process act of 1828, was passed shortly after the decision of the cases of *Wayman* v. *Southard* and the *United States Bank* v. *Halstead*, and was intended as a legislative sanction to the opinions of the Court in those cases.

It must, therefore, be regarded as settled, that the act of 1828, adopted for the Federal Courts in this state, the state laws regulating executions then in force, and not such as have been subsequently enacted; and as no rules have since been made by the *United States* Courts conforming such executions to the laws of the state, the law in force in this state in *May*, 1828, governing executions issuing from the Supreme Court, that being the only Court having a similar extent of jurisdiction, must be considered as, from that time to the present, applicable to executions issued from the National Courts.

The act organizing the Supreme Court of this state, and defining its powers and duties, approved *January* 2d, 1824, provides (s. 9) that executions to be issued from

said Court shall be the same which are or may be by law directed to be issued from the Circuit Courts, and that the Supreme Court shall have power to direct all other writs, processes, summonses, forms, and modes of proceedings to be issued, observed, and used by said Court, and to make rules for that purpose, &c.

There is a striking similarity in these provisions to those of the acts of congress before mentioned, and it is argued by the counsel for the defendant in error, with much apparent plausibility, that, as the words used in those acts are construed to give judgments of the Federal Courts the same lien as judgments of the state Courts, the use of almost the same words in the state act just quoted, should be held to mean that judgments rendered by the Supreme Court should have the same lien and no greater than those rendered by the Circuit Courts. But there is this difference; that, while the meaning and intent of the acts of congress relative to process, before quoted, must be gathered from those acts alone, the act of the state legislature, directing that executions of the Supreme Court shall be the same as those issued by the Circuit Courts, must be considered in connection with other acts in force at the time, and which we have not yet alluded to.

The act organizing Circuit Courts, passed at the first session of the legislature of this state, (Acts of 1817, p. 15,) gave to those Courts jurisdiction in each county and power to issue writs and other process necessary for the maintenance of such jurisdiction, according to the course of the common law and the usages of Courts. The act organizing the Supreme Court, passed at the same session, gave to the latter Court jurisdiction co-extensive with the limits of the state, and contained a provision similar to that we have just quoted from the act of 1824, that the executions to be issued should be the same as those which should be by law directed to be issued from the Circuit Courts, &c. The first act on the subject of executions, passed after the organization of the state government, was that approved *January* 7th, 1818, (Acts

of 1818, p. 185,) by the first section of which all personal and real estate belonging to any individual, company, or body politic or corporate, is made subject to judgment and execution; and the 13th section of an act for the prevention of frauds and perjuries, passed at the same session, (p. 118,) contains the following provisions:

" Any Court of record, judge, or officer of any Court of record within this state, that shall sign any judgments, shall, at the signing of the same, without fee or reward for doing the same, set down the day and month of the year of his so doing upon the record which he shall sign, and such judgments as against purchasers, *bona fide*, for valuable consideration, of lands, tenements, or hereditaments, to be charged thereby, shall, in consideration of law, be judgments from such times as they shall be so signed."

These acts appear to have been generally understood to have created an express lien in favor of judgments upon the real estate of the defendants. That they were so understood by the legislature would appear from a clause of the act to amend the act last mentioned, approved *January* 18th, 1820, (Acts of 1820, p. 114,) which provides that property levied on may be released by the defendant giving a replevin-bond, which bond should have the same force and effect as judgments then had in binding real property.

As the law stood at this point of time, then, the Supreme Court had jurisdiction throughout the state, and the Circuit Courts in the respective counties, and there can be no doubt that the liens of their judgments were co-extensive with the limits of their jurisdiction.

An act, supplemental to the act organizing Circuit Courts, was passed *December* 11th, 1821. Acts of 1822, p. 20. By this act the Circuit Courts were authorized to issue writs of execution to any county within the state in certain cases. By the second section it was declared that judgments rendered in the Circuit Courts were made liens upon real estate situate in the county where they should be rendered from the day of the rendition thereof; and,

by the third section, any person interested was authorized to procure an attested copy of such judgment and file such copy in the office of any clerk of any Circuit Court in the state, and from the time such attested copy was so filed, the judgment became a lien on the real estate of the defendants in the county where such copy was filed. This is the first act we find authorizing writs to be issued by the Circuit Courts to other counties than those in which their judgments were rendered, and it seems plain that its provisions were not intended to be restrictive of the liens of judgments in any case. As the jurisdiction of the Circuit Courts did not before extend beyond the limits of the respective counties in which such Courts were held, neither could the liens of their judgments operate out of those counties. The obvious purpose of this act, was to give the Circuit Courts authority to issue executions and to extend the lien of their judgments to other counties than those in which the judgments were rendered, in the cases specified, but by no rule of construction can we arrive at the conclusion that it was the intention of the legislature to limit or abridge the liens which had before been given to judgments of the Supreme Court.

The provisions of the last recited act were continued in the R. S. of 1824, p. 192, s. 13, but no further alteration was made by the statutes of this state, with respect to the liens of judgments, until after the passage of the act of congress of *May*, 1828. We are of opinion, therefore, that as judgments of the Supreme Court of this state, were liens upon the real estate of the defendants throughout the state, before the passage of the acts of 1821 and 1824, and as it appears that, by those acts, the legislature did not intend to limit the liens of judgments then existing in any case, but only to give an additional lien to judgments of the Circuit Courts, in cases where a lien did not before exist, and could not have been obtained, the laws giving judgments of the Supreme Court liens throughout the state were still in force in 1828, and were

Nov. Term, 1848.

SIMPSON
v.
NILES.

Nov. Term,
1848.

consequently adopted by the process act of congress of that year.

It must follow that *Polke's* interest in the *Plymouth* tract of land, as described in the bill of complaint, was bound by the lien of the judgment, or what amounted to a judgment, the execution of the replevin-bond in the Circuit Court of the *United States.* He could, therefore, make no valid conveyance of that interest to the prejudice of the judgment-creditor, and the decree of the Circuit Court perpetually enjoining *Simpson* from levying upon it, without payment to him of the purchase-money remaining due when the lien attached, is erroneous.

*Per Curiam.*—The decree is reversed with costs. Cause remanded, &c.

*D. D. Pratt,* for the plaintiff.

*J. B. Niles, A. L. Osborn,* and *C. Dewcy,* Senr., for the defendant.