[CONSTITUTIONAL LAW. PRACTICE.]

# THE BANK OF THE UNITED STATES v. HALSTEAD.

The act of assembly of Kentucky of the 21st of December, 1821, which prohibits the sale of property taken under executions for less than three fourths of its appraised value, without the consent of the owner, does not apply to a *venditioni exponas* issued out of the Circuit Court for the District of Kentucky.

The laws of the United States authorize the Courts of the Union so to alter the form of the process of execution used in the Supreme Courts of the States in 1789, so as to subject to execution lands and other property, not thus subject by the State laws in force at that time.

THIS cause was argued at the last term, by the same counsel with the preceding case of *Wayman v. Southard*, (ante p. 1.) and continued to the present term for advisement.

Mr. Justice THOMPSON delivered the opinion of the Court. Feb. 15th, 1825.

This case comes up on a division of opinion of the Judges of the Circuit Court of the United States for the District of Kentucky, upon a motion there made to quash the return of the Marshal upon a *venditioni exponas* issued in this cause. The writ commanded the Marshal to expose to sale certain articles of property therein particularly specified; and, among other things, two hundred acres of land of Abraham Venable, one of the defendants. The Marshal, in his return, states substantially, that he had exposed to

1825.

U. S. Bank
v.
Halstead.

sale, for cash, the lands mentioned in the writ, no endorsement having been made on the execution, to receive in payment certain bank notes, according to the provision of the laws of Kentucky. That the lands had been valued at 26 dollars per acre, and, upon the offer for sale, no more than five dollars per acre was bid; which not being three fourths of the appraised value, the land was not sold: thereby conforming his proceedings under the *venditioni exponas* to the directions of the law of Kentucky of the 21st of December, 1821, which prohibits the sale of property taken under executions, for less than three fourths of its appraised value, without the consent of the owner.

The motion in the Court below was to quash this return, and to direct the Marshal to proceed to sell the land levied upon, without regard to the act above referred to. Upon this motion, the Judges, being divided in opinion, have, according to the provisions of the act of Congress in such cases, certified to this Court the following questions:

1. Whether the said act of the general assembly of Kentucky, when applied to this case, was, or was not, repugnant to the constitution of the United States? and,

2. Whether, if it were not repugnant to the constitution, it would operate upon, and bind, and direct, the mode in which the *venditioni exponas* should be enforced by the Marshal, and forbid a sale of the land levied upon, unless it commanded three fourths of its value when esti-

mated, according to the provisions of the said act?

In examining these questions, I shall invert the order in which they have been certified to this Court, because, if the law does not apply to the case so as to regulate and govern the conduct of the Marshal, it will supersede the necessity of inquiring into its constitutionality.

It ought to be borne in mind, that this law does not profess, in terms, to extend to Marshals, or to executions issued out of the Courts of the United States; and it is only under some general expressions, that either can, by possibility, be embraced within the law. And it ought not, in justice to the legislature, to be presumed, that it was intended, by any general terms there used, to regulate and control that over which it is so manifest they had no authority.

It cannot certainly be contended, with the least colour of plausibility, that Congress does not possess the uncontrolled power to legislate with respect both to the form and effect of executions issued upon judgments recovered in the Courts of the United States. The judicial power would be incomplete, and entirely inadequate to the purposes for which it was intended, if, after judgment, it could be arrested in its progress, and denied the right of enforcing satisfaction in any manner which shall be prescribed by the laws of the United States. The authority to carry into complete effect the judgments of the Courts, necessarily results, by implication, from the power to ordain and establish such Courts.

1825.
U. S. Bank
v.
Halstead.

But it does not rest altogether upon such implication; for express authority is given to Congress to make all laws which shall be necessary and proper for carrying into execution all the powers vested by the constitution in the government of the United States, or in any department or officer thereof. The right of Congress, therefore, to regulate the proceedings on executions, and direct the mode, and manner, and out of what property of the debtor satisfaction may be obtained, is not to be questioned, and the only inquiry is, how far this power has been exercised: The critical review taken by the Chief Justice of the various laws of the United States, in the opinion delivered in the case of *Wayman* v. *Southard*,[a] very much abridges an examination, that might otherwise have been proper in this case. The result of that opinion shows, that Congress has adopted, as the guide for the Courts of the United States, the processes which were used and allowed in the Supreme Courts of the several States, in the year 1789. That the 34th section of the Judiciary Act, which requires that the laws of the several States shall be regarded as rules of decision in trials ε common law, in the Courts of the United States, has no application to the practice of the Courts; or in any manner calls upon them to pursue the various changes which may take place from time to time in the State Courts, with respect to their processes, and modes of proceeding under them. The princi-

*a Ante* p. 20.

pal inquiry in this case is, whether the laws of the United States authorize the Courts so to alter the form of the process of execution, which was in use in the Supreme Courts of the several States in the year 1789, as to uphold the *venditioni exponas* issued in this cause. In the year 1792, when the Process Act of 1789 was made perpetual, land in the State of Kentucky could not be taken and sold on execution; a law, however, subjecting lands to executions, was passed shortly thereafter in the same year; and the question now arises, whether the Circuit Court of the United States for the Kentucky District, could so alter the process of execution as to authorize the seizure and sale of land by virtue thereof.

For the decision of this question, it is necessary again to recur to some of the acts of Congress which were under consideration in the case referred to, for the purpose of ascertaining whether they do not provide as well for the *effect* and operation, as for the form of process.

By the 14th section of the Judiciary Act, (2 *L. U. S.* 62.) power is given to the Courts of the United States to issue a writ of *scire facias, habeas corpus*, and all other writs not specially provided for by statute, which may be necessary for the exercise of their respective jurisdictions, and agreeable to the principles and usages of law. That executions are among the writs hereby authorized to be issued, cannot admit of a doubt; they are indispensably necessary for the beneficial exercise of the jurisdiction of the Courts: and in subsequent parts of the act,

this writ is specifically named as one to be used, and the control which the Court, in certain cases, is, authorized to exercise over it, is pointed out. The precise limitations and qualifications of this power, under the terms, *agreeable to the principles and usages of law,* is not, perhaps, so obvious. It doubtless embraces writs sanctioned by the principles and usages of the common law. But it would be too limited a construction, as it respects writs of execution, to restrict it to such only as were authorized by the common law. It was well known to Congress, that there were in use in the State Courts, writs of execution, other than such as were conformable to the usages of the common law. And it is reasonable to conclude, that such were intended to be included under the general description of writs agreeable to the principles and usages of law. If it had been intended to restrict the power to common law writs, such limitation would probably have been imposed in terms. That it was intended to authorize writs of execution sanctioned by the principles and usages of the State laws, is strongly corroborated by the circumstance, that the Process Act, passed a few days thereafter, adopts such as the only writs of execution to be used. Can it be doubted, but that, under the power here given in the Judiciary Act, the Courts of the United States, in those States where lands were liable to be taken and sold on execution, would have been authorized to issue a like process? But under this act, the Courts are not restricted to the kind of process used in the State

Courts, or bound in any respect to conform themselves thereto. This latitude of discretion was not deemed expedient to be left with the Courts; and the act of the 29th of September, 1789, [2 *L. U. S.* 72.] entitled, "An act to regulate processes in the Courts of the United States," modifies and limits this power. So far as is material to the present inquiry, it declares, that the forms of writs and executions, and modes of process, in the Circuit and District Courts, in suits at common law, shall be the same in each State respectively, as are *now* used or allowed in the Supreme Courts of the same. The form of the writ contains substantially directions as to what is to be done under it. Whether mesne or final process, it is on its face so shaped and moulded, as to be adapted to the purposes for which it is intended. This act, therefore, adopts the effect as well as the form of the State processes; and as these were various in the different States, it goes further, and adopts the *modes of process,* which must include every thing necessary to a compliance with the command of the writ. The effect and operation of executions must, of course, vary in the different States, according to the different forms which were used and allowed. The mode of proceeding, where lands, for instance, were liable to be taken and sold on execution, was different from that which would be necessary where they were only liable to be extended under an *elegit*. It was therefore necessary to adopt the modes of process, if the process itself was adopted. This act was temporary; and con-

1825.

U. S. Bank
v.
Halstead.

1825.    tinued from time to time, until the permanent law
U. S. Bank    of the 8th of May, 1792, [2 *L. U. S.* 299.]
v.    was passed; the second section of which, so far
Halstead.    as relates to the second question, declares, that
the forms of writs, executions, and other process,
except their style, and the forms and modes of
proceeding in suits of common law, in the Courts
of the United States, shall be the same as are
*now* used in the said Courts, in pursuance of the
act entitled, " an act to regulate processes in the
Courts of the United States." This section then
goes on to prescribe the rules and principles by
which the Courts of equity, and of admiralty
and maritime jurisdiction, were to be governed;
and then follows this provision: Subject, how-
ever, to such alterations and additions, as the
said Courts respectively shall, in their discretion,
deem expedient, or to such regulations as the
Supreme Court of the United States shall think
proper, from time to time, by rule, to prescribe
to any Circuit or District Court concerning the
same. There can be no doubt, that the power
here given to the Courts, extends to all the sub-
jects in the preceding parts of the section; and
embraces as well the forms of process, and modes
of proceeding in suits of common law, as those
of equity, and of admiralty and maritime juris-
diction. It will be perceived, that this act pre-
supposes that, in point of practice, the several
Courts of the United States had carried into exe-
cution the provisions of the act of 1789; and
had adopted the forms of process, and modes of
proceeding thereon, which were then usual, and

allowed in the Supreme Courts of the respective States; and it ratifies and continues such practice, and extends it to all the proceedings in suits. This course was no doubt adopted, as one better calculated to meet the views and wishes of the several States, than for Congress to have framed an entire system for the Courts of the United States, varying from that of the State Courts. They had in view, however, State systems then in actual operation, well known and understood, and the propriety and expediency of adopting which, they would well judge of and determine. Hence the restriction in the act, *now* used and allowed in the Supreme Courts of the several States. There is no part of the act, however, that looks like adopting prospectively, by positive legislative provision, the various changes that might thereafter be made in the State Courts. Had such been the intention of Congress, the phraseology of the act would doubtless have been adapted to that purpose. It was, nevertheless, foreseen, that changes probably would be made in the processes and proceedings in the State Courts, which might be fit and proper to be adopted in the Courts of the United States; and, not choosing to sanction such changes absolutely in anticipation, power is given to the Courts over the subject, with a view, no doubt, so to alter and mould their processes and proceedings, as to conform to those of the State Courts as nearly as might be, consistently with the ends of justice. This authority must have been given to the Courts, for some substantial and beneficial

purpose. If the alterations are limited to *mere form,* without varying the effect and operation of the process, it would be useless. The power here given, in order to answer the object in view, cannot be restricted to *form* as contradistinguished from substance, but must be understood as vesting in the Courts authority, so to frame, mould, and shape the process, as to adapt it to the purpose intended.

The general policy of all the laws on this subject is very apparent. It was intended to adopt, and conform to, the State process and proceedings, as the general rule, but under such guards and checks as might be necessary to insure the due exercise of the powers of the Courts of the United States. They have authority, therefore, from time to time to alter the process, in such manner as they shall deem expedient, and likewise to make *additions* thereto, which necessarily implies a power to enlarge the effect and operation of the process. The exercise of this power is, to be sure, left in the discretion of the Court; but the object and purpose for which it is given, is so plainly marked, that it is hardly to be presumed the Courts would omit carrying it into execution, without some substantial reason. And, the better to insure this, authority is given to this Court, to prescribe to the Circuit and District Courts, such regulations on the subject as it shall think proper. And should this trust not be duly and discreetly exercised by the Courts, it is at all times in the power of Congress to correct the evil by more specific legislation. But so long as

the Courts of the United States shall make such alterations or additions in their process of execution as only to reach property made subject to execution from the State Courts, there would seem to be no just ground for complaint. When, therefore, the law of Kentucky made land subject to executions, it was carrying into effect the spirit and object of the act of Congress, for the Circuit Court so to alter and add to the form of its execution, as to authorize the taking and selling the debtor's land.

It is said, however, that this is the exercise of legislative power, which could not be delegated by Congress to the Courts of justice. But this objection cannot be sustained. There is no doubt that Congress might have legislated more specifically on the subject, and declared what property should be subject to executions from the Courts of the United States. But it does not follow, that because Congress might have done this, they necessarily must do it, and cannot commit the power to the Courts of justice. Congress might regulate the whole practice of the Courts, if it was deemed expedient so to do: but this power is vested in the Courts; and it never has occurred to any one that it was a delegation of legislative power. The power given to the Courts over their process is no more than authorizing them to regulate and direct the conduct of the Marshal, in the execution of the process. It relates, therefore, to the ministerial duty of the officer; and partakes no more of legislative power, than that discretionary authority in

trusted to every department of the government in a variety of cases. And, as is forcibly observed by the Court, in the case of *Wayman* v. *Southard,* the same objection arises to delegating this power to the state authorities, as there does to intrusting it to the Courts of the United States. It is as much a delegation of legislative power in the one case as in the other. It has been already decided, in the case referred to, that the 34th section of the Judiciary Act has no application to the practice of the Courts of the United States, so as in any manner to govern the form of the process of execution. And all the reasoning of the Court, which denies the application of this section to the form, applies with equal force to the effect or extent and operation of the process. If, therefore, Congress has legislated at all upon the *effect* of executions, they have either adopted and limited it to that which would have been given to the like process from the Supreme Courts of the respective States, in the year 1789, or have provided for changes, by authorizing the Courts of the United States to make such alterations and additions in the process itself, as to give it a different effect.

To limit the operation of an execution *now,* to that which it would have had in the year 1789, would open a door to many and great inconveniencies, which Congress seems to have foreseen, and to have guarded against, by giving ample powers to the Courts, so to mould their process, as to meet whatever changes might take place. And if any doubt existed, whether the act of 1792 vests such power in the Courts, or with respect to its con-

stitutionality, the practical construction heretofore given to it, ought to have great weight in determining both questions. It is understood, that it has been the general, if not the universal practice of the Courts of the United States, so to alter their executions, as to authorize a levy upon whatever property is made subject to the like process from the State Courts; and under such alterations, many sales of land have no doubt been made, which might be disturbed if a contrary construction should be adopted. That such alteration, both in the form and effect of executions, has been made by the Circuit Court for the District of Kentucky, is certain from the case now before us, as, in 1789, land in Kentucky could not be sold on execution. If the Court, then, had the power so to frame and mould the execution in this case, as to extend to lands, the only remaining inquiry is, whether the proceedings on the execution could be arrested and controlled by the State law. And this question would seem to be put at rest by the decision in the case of *Wayman* v. *Southard*. The law of Kentucky, as has been already observed, does not in terms profess to exercise any such authority; and if it did, it must be unavailing. An officer of the United States cannot, in the discharge of his duty, be governed and controlled by State laws, any farther than such laws have been adopted and sanctioned by the legislative authority of the United States. And he does not, in such case, act under the authority of the State law, but under that of the United States,

which adopts such law. An execution is the fruit and end of the suit, and is very aptly called the life of the law. The suit does not terminate with the judgment; and all proceedings on the execution, are proceedings in the suit, and which are expressly, by the act of Congress, put under the regulation and control of the Court out of which it issues. It is a power incident to every Court from which process issues, when delivered to the proper officer, to enforce upon such officer a compliance with his duty, and a due execution of the process, according to its command. But we are not left to rest upon any implied power of the Court, for such authority over the officer. By the 7th section of the act of the 2d of March, 1793, (3 *L. U. S.* 367.) it is declared, that " it shall be lawful for the several Courts of the United States, from time to time, as occasion may require, to make rules and orders for their respective Courts, directing the returning of writs and processes, &c. and to regulate the practice of the said Courts respectively, in such manner as shall be fit and necessary for the advancement of justice, and *especially* to the end to prevent *delays* in proceedings." To permit the Marshal, in this case, to be governed and controlled by the State law, is not only delaying, but may be entirely defeating the effect and operation of the execution, and would be inconsistent with the advancement of justice.

Upon the whole, therefore, the opinion of this Co t is, that the Circuit Court had authority to alter the form of the process of execution, so as

to extend to real as well as personal property, when, by the laws of Kentucky, lands were made subject to the like process from the State Courts; and that the act of the General Assembly of Kentucky does not operate upon, and bind, and direct the mode in which the *venditioni exponas* should be enforced by the Marshal, so as to forbid a sale of the land levied upon, unless it commanded three fourths of its value, according to the provisions of the said act; and that, of course, the return of the Marshal is insufficient, and ought to be quashed. This renders it unnecessary to inquire into the constitutionality of the law of Kentucky.

CERTIFICATE. This cause came on to be heard on the transcript, &c. and the points on which the Judges of the Circuit Court of the United States for the seventh Circuit and District of Kentucky, were divided in opinion, and which were, in pursuance of the act of Congress in that case made and provided, adjourned to this Court, and was argued by counsel. On consideration whereof, this Court is of opinion, that the act of the General Assembly of Kentucky, referred to in the said questions, cannot operate upon, bind, and direct the mode in which the said *venditioni exponas* should be enforced by the Marshal, and forbid a sale of the land levied upon, unless it commanded three fourths of its value when estimated according to the provisions of the said act; and that this opinion renders it unnecessary to decide whether the said act is, or

1825.

U. S. Bank
v.
Halstead.

is not, repugnant to the constitution of the United States. All which is directed to be certified to the Circuit Court of the United States for the seventh circuit and District of Kentucky.[a]

*a* In the case of the *Bank of the United States* v. *January,* also certified from the Circuit Court of Kentucky, the process was a *capias,* to which the acts of 1789, and 1792, extend in express terms. This Court, therefore, determined, that Congress must be understood to have adopted that process as one that was to issue permanently from the Courts of the United States, whenever it was in use, at the epoch contemplated by those acts, as a State process. A certificate was directed accordingly.