## CROSBY v. PACIFIC S. S. LINES, Ltd.
### No. 10155.

Circuit Court of Appeals, Ninth Circuit.

Jan. 25, 1943.

Rehearing Denied March 16, 1943.

Hy Schwartz, of Los Angeles, Cal., and Samuel S. Stevens and Heller, Ehrman, White & McAuliffe, all of San Francisco, Cal., for appellant.

Keith R. Ferguson, of San Francisco, Cal., for appellee.

Before MATHEWS, HANEY, and HEALY, Circuit Judges.

HANEY, Circuit Judge.

Appeal was attempted from an order confirming a report of a special master recommending that appellant's petition for allowance of a commission be denied.

The parties assume that appellee is under the jurisdiction of the court below in a proceeding under § 77B of the Bankruptcy Act, 11 U.S.C.A. § 207. The record before us contains neither a petition nor an order disclosing that fact, but we treat the assumption of the parties as a concession of the fact.

Appellant filed a petition on June 17, 1941, alleging that within the preceding two years, appellee, by its president James, employed appellant as a ship broker to sell two ships belonging to appellee, known as S.S. "Emma Alexander" and the S.S. "H. F. Alexander", and agreed to pay appellant a commission of five per cent of the sales price "in the event he should produce a purchaser ready, willing and able to purchase said vessels on terms satisfactory" to appellee; that pursuant to the agreement appellant produced the British Ministry of Shipping as a purchaser ready, willing and able to purchase the vessels on terms satisfactory to appellee; that appellee sold the vessels to the British Ministry of Shipping for $1,250,000 on March 28, 1941; and that the commission due appellant was $62,500. He prayed that he be allowed that sum for the services rendered.

By answer, appellee denied the employment of appellee as alleged in the petition, admitted the sale of the vessels, and alleged that the sale was made directly by appellee without the aid of any broker or brokers whatsoever.

The matter was referred to a special master and subsequently re-referred. Be-

fore relating the evidence and because of the numerous parties involved, we state that the evidence is quite meagre regarding the British Ministry of Shipping.[1] The evidence indicates, that insofar as the United States is concerned, the "head" of the Ministry is Sir Ashley Sparks; that immediately subordinate to Sparks is one Boyd, an assistant to the former; that immediately subordinate to Boyd are several directors, two of whom are Rees and Bowring; and that the "representative" of the Ministry on the Pacific Coast was one Walsh. While Walsh testified that the "Ministry on the Pacific Coast is an individual, J. J. Walsh", there is other evidence disclosing that he was subordinate to Sparks, Boyd and the directors.

In August or September, 1939, James, President of appellee, authorized appellant to offer the Steamships "H.F. Alexander" and "Emma Alexander" for sale. Appellant has been for many years a ship broker and had previously sold several vessels for appellee and was paid a commission for his services. Appellant engaged the services of one Harrison, and the latter engaged the services of Bowring & Company. Later, appellant engaged the services of one Alexander, who engaged the services of one Fischer. Through one or more of these associates, the vessels were offered to representatives of the Ministry many times. They were offered to Sparks, Boyd, Rees and possibly Bowring of the Ministry and to Admiral Potts, Naval Attache to the British Embassy in Washington. Plans and other data were submitted and a great deal of time consumed in attempting to dispose of the vessels. The special master excluded evidence showing the money spent in attempting to negotiate the sales. There was evidence that the vessels were first offered to the Ministry by appellant's associates. The only answers obtained from these results were to the same effect—the Ministry was not then interested in the vessels.

During the period prior to 1941, James had attempted to dispose of the vessels to the Ministry through Walsh and through an advisor to the Ministry, but the latter showed no desire to purchase the vessels. The vessels had also been offered by another broker but with the same result. James testified that seven or eight other brokers, other than Crosby and his associates, were trying to dispose of the vessels, but it is not clear how many, if any, of them had offered the vessels to the Ministry.

Shortly prior to January 3, 1941, Walsh advised James that the Ministry might then be interested in the two vessels. Plans were submitted to Walsh. About January 3, 1941, Crosby and Alexander conferred with James who told them that the vessels had been offered to the Ministry through Walsh. Alexander then telegraphed Boyd in part: "Have been informed that John Walsh * * * has made formal offers to owners of Emma Alexander three hundred thousand dollars for British Ministry Shipping, also tentative offer for H.F. Alexander * * *" Boyd replied by telegram as follows: "Walsh is ministry representative San Francisco but has not made any offers for Alexander vessels stop there is just a possibility we might be interested in H.F. and I suggest you give us refusal of her for as long time as possible * * *."

It is the custom, in connection with sales of vessels, that, when a broker finds a prospect showing interest, he obtains from the owner a commitment commonly called an option by which the broker may give the prospect a right to purchase the vessel at the stated price at any time before a fixed date. Boyd, by using the words "refusal" of the vessel, was referring to such a commitment.

By a letter dated January 17, 1941, James informed appellant that

"The Pacific Coast representative of the British Ministry of Shipping obtained from us some time ago the particulars of the vessel and cabled them to London. The fact that he has done so was confirmed through one of our directors.

"In view of the foregoing we could not consistently offer any one else the refusal of the ship for sale to this prospective purchaser."

There was evidence that Crosby, or one of his associates, informed James that if the sale were consummated with the Ministry, Crosby was expecting to be paid a commission.

The negotiations through Walsh resulted in the purchase of the vessels by the Ministry for the total amount of $1,250,000, about March 18, 1941. From various statements in the record it may be inferred that a petition for approval of the sale was filed in and granted by the court below;.

---

[1] Now, the British Ministry of War Transport.

and that James claimed and was paid a commission on the sales by order of the court below. There are no petitions or orders in the record supporting either of these statements.

There were excerpts from periodicals showing that negotiations for the purchase of the vessels were being carried on with the Ministry, and announcing the sales of such vessels. This is particularly pertinent in view of the discussion herein of evidence of "state" secrets. Delivery of the vessels was made to a nominee of the Ministry in Canada.

Appellee called Walsh as a witness on its behalf. On cross-examination, Walsh was asked if he had any correspondence with the New York office relating to the vessels. He replied in the affirmative. Appellant then demanded production of the correspondence. Walsh replied: "I will produce it if given authority by the British Government to do it, because that correspondence, in most instances, is mixed with other correspondence that has nothing to do with this case". At this point, over appellant's objection, appellee's counsel questioned Walsh and elicited the following facts: that the correspondence was of an official nature, belonging to the British Ministry of War Transport which is an arm of the British Government, and "The correspondence all belongs to the British Government; all the correspondence of the British Government, under my instructions, is confidential, not to be disclosed to anyone outside of the British Government".

After some statements of the special master, appellant's counsel and appellee's counsel, the following occurred:

"Mr. Stevens [for appellant]: I will state this: I made an examination of the authorities since this witness' deposition was taken, and I have been unable to find any authority which authorizes an official, such as a Deputy Minister of Shipping, to refuse to produce documents.

"The Master: If there is no law on it, I will make the law right now.

"Mr. Ferguson [for appellee]: There is the provision in your own Civil Code of Procedure.

"Mr. Stevens: I say to the Court—

"The Master: You do not need to cite law. I will make the law on it."

Upon the basis of the testimony of the witness previously given, the special master refused to compel Walsh to produce any correspondence which he, Walsh, considered confidential.

Thereafter, Walsh testified that some of the correspondence referred only to the vessels, while other correspondence included other matters. He at no time testified that he had been directed by any superior to treat any correspondence confidential, or that any other officer (if he is such) of the British Government considered the correspondence as confidential, or that he had been directed to refuse to produce any correspondence in conformity with order of court, or the extent of the authority, if any, he had. He gave no evidence directly or indirectly to show why or in what manner he considered the correspondence confidential. Appellant moved to strike all evidence of the witness on the ground that he had refused to produce the correspondence on cross-examination. The special master denied the motion. Insofar as the record discloses, the special master insisted on "making" the law and showed no interest in any argument thereon. The only authority mentioned was § 1881, Calif. Code of Civil Procedure, read by appellee's counsel to appellant's counsel.

The special master's recommendation was the same on both references. He found: (1) that appellant did not produce a prospective purchaser who, at any time, was ready, able, and willing to purchase the vessels for the net figures asked; (2) that the sales were negotiated by appellee, without the aid of a broker; (3) that there was no negligence, fault, or fraud, on the part of appellee in connection with the sale of the vessels or its relations with appellant; and (4) that appellant was guilty of laches in failing to object to the confirmation of the sales of the vessels by the court below. He recommended dismissal of appellant's petition.

An order was made by the court below as follows: "* * * it is Ordered that the objections to the certificate and report of the Special Master on the issues raised by the Petition of Roy W. Crosby for compensation for services rendered as ship broker are overruled, and the Certificate and Report of the Special Master is approved". However, no order was made dismissing the petition.

▮ Technically speaking, the appeal herein is invalid because there was no order dismissing the petition. However, the intent to dismiss is clear. Under such cir-

cumstances we treat the order above recited as one containing an error "arising from oversight or omission" within the meaning of Federal Rules of Civil Procedure, rule 60(a), 28 U.S.C.A. following section 723c, which, thereunder, may be corrected at any time. It would be mere form for us to remand the case so that the amendment might be made, and therefore we shall consider the order as amended. Compare: Norton v. Larney, 266 U.S. 511, 516, 45 S.Ct. 145, 69 L.Ed. 413; Realty Holding Co. v. Donaldson, 268 U.S. 398, 400, 45 S.Ct. 521, 69 L.Ed. 1014.

It is not contended that appellant had an exclusive agency to sell the vessels, except at those times when he was given a so-called "option". It is contended, and it cannot be successfully disputed in view of the evidence, that appellant did have authority to attempt to find a buyer for the vessels and if he did find such a buyer, then he was entitled to a commission. Appellee relies on cases where the broker was denied a commission because he had not produced a buyer within the time limit of his original authority, and like cases. These cases have no bearing here unless it can be said that the letter written by James in 1941, declining to give a "refusal" of the vessel, restricted the authority of the broker. We think that conclusion to be erroneous for two reasons: (1) the letter referred only to the so-called "option" and not to appellant's authority otherwise; and (2) it would be unreasonable to hold that a principal could give general authority to a broker, and after knowledge that the broker has found a possible buyer, restrict the broker's authority, complete the sale to the "possible" buyer, and thus avoid payment of a commission.

The applicable rule is stated in Brea v. McGlashan, 3 Cal.App.2d 454, 465, 39 P.2d 877, 882, as follows:

"* * * For otherwise, one might employ an agent to interview persons, and secure from them promises of contracts and then, by having another one 'close' the contracts, deny the agent the fruit of his labor. The law does not sanction such action. On the contrary, the rule is that if an agent (or broker) is the inducing or procuring cause of the contract, he is entitled to the commission, even though the principal takes it out of his own hand and completes it. The originating cause, which ultimately led to the conclusion of the transaction, is held to be the procuring cause. Sessions v. Pacific Improvement Co., 57 Cal.App. 1, 206 P. 653; Bail v. Glantz, 78 Cal.App. 49, 248 P. 258."

See, also, Larabee v. Republic Bond, etc., Co., 100 Cal.App. 447, 451, 280 P. 149; Barrios v. Foley, 83 Cal.App. 105, 109, 256 P. 573, and cases there cited; 4 Cal.Jur. 605 §§ 38–44.

It thus appears that appellant was entitled to a commission, if his efforts were the "procuring cause" of the sale. The special master did not make, but should have made, a direct finding on that issue. There was a finding that appellee negotiated the sales without the aid of any broker, which clearly negatives any idea that appellant was the procuring cause of the sales. Was that finding clearly erroneous? Federal Rules of Civil Procedure, Rule 52(a); General Orders in Bankruptcy, No. 36 and 49(2), 11 U.S.C. A. following section 53.

Under the record, as it now stands, we cannot set the finding aside. Proof of negotiations, as shown here, by appellant, even though he first negotiated with the Ministry, where other brokers and the owner also negotiated with the Ministry, does not show that appellant was the "procuring cause" of the sales. Who caused the purchase or brought the sale about? To answer that question requires evidence of the purchaser's state of mind which might be shown by admissions or actions. On that vital point, there is almost a complete absence of evidence.

On the point last mentioned, however, the correspondence between Walsh and the New York office of the Ministry, might clearly indicate who the "procuring cause" of the sales was. If the special master's action in refusing to compel Walsh to produce the correspondence was right, then the finding must be sustained, but if erroneous, then a new trial must be had.

Pursuant to General Orders in Bankruptcy, Nos. 22, 37 and 49(2), we look to the Federal Rules of Civil Procedure, for the applicable rule. Rule 43(a) provides in part:

"* * * All evidence shall be admitted which is admissible under the statutes of the United States, or under the rules of evidence heretofore applied in the courts of the United States on the hearing of suits in equity, or under the rules of evidence applied in the courts of general jurisdiction of the state in which the United

States court is held. In any case, the statute or rule which favors the reception of the evidence governs and the evidence shall be presented according to the most convenient method prescribed in any of the statutes or rules to which reference is herein made. The competency of a witness to testify shall be determined in like manner."

Compare: 28 U.S.C.A. § 631.

It is not contended that Walsh was justified in refusing to produce the correspondence for any reason other than on his statement that it was confidential. There is no reference to a treaty between the United States and Great Britain which provides immunity from production.

Appellees rely on California Code of Civil Procedure § 1881, subdiv. 5, which provides: "A public officer can not be examined as to communications made to him in official confidence, when the public interest would suffer by the disclosure."

There are grave doubts whether that statute has any application here. Does it not refer to a "public officer" of California only? By its terms it applies only to communications "made to him". Even if it otherwise applied, it could not justify the refusal of correspondence written by Walsh to someone else. Finally, refusal would be justified only "when the public interest would suffer by the disclosure". Does this mean that Walsh is the final authority on that point? All reason says that the question is one for the court to determine. 8 Wigmore on Evidence, 3rd Ed., 798, § 2379. Since Walsh gave no reason other than that he considered the correspondence confidential, the special master could not have decided whether the public interest would suffer by the disclosure.

However, if we assume, despite these objections, that the said section would justify the refusal to produce, the question is not completely solved. If under the rule "heretofore applied in the courts of the United States", the refusal was unjustified, the special master should have compelled production of the correspondence pursuant to the Federal Rules of Civil Procedure above quoted.

No case has been cited, and we find none precisely in point. It is clear, we think, that the federal courts would have applied any rule of international law bearing on the point, or the provisions of a treaty. Neither has been cited. Appellee contends the same rule should be applied here as is applied to consuls. See 3 Wigmore on Evidence 743, § 2372. We believe the two cases are dissimilar. The special treatment of consuls is caused probably in part by treaty, in part by the fact that they are under the jurisdiction of the diplomatic department of government, and in part by the character of their business and permanence of existence and locality. However, even if we should apply the rule, there is no showing that Walsh was authorized to claim the privilege on behalf of the British Government.

We think the rule to be applied is the one we would apply to a similar department of government here. On that question, the arguments as to policy are exhaustively treated in 3 Wigmore on Evidence 779-801, § 2378, 2379, and it is unnecessary here to repeat them. We need not attempt to mark the limits of the rule here, because of the absence of many facts necessary to such an attempt. All we can hold here is that it was error to refuse to compel Walsh to produce the correspondence for the inspection of the special master to determine their admissibility in evidence, because of an absence of showing: (1) existence of a rule of the British Ministry of Shipping that all correspondence between its officers is confidential; (2) existence of a direction, by an officer superior to Walsh, to Walsh that the correspondence is confidential; (3) existence of a direction to Walsh by an officer superior to Walsh, authorizing the latter to determine what correspondence is confidential; and (4) how the correspondence would in any manner jeopardize the public interest, safety or security.

Whether, upon showing one or more of these things, and if so, which of them would justify the action of the special master, we do not decide. It is enough to say that for one to claim a privilege, he must make a showing that he is entitled to one, and that no such showing, in our opinion, was made here.

It is unnecessary to discuss other questions argued.

Reversed.