UNITED STATES of America, Plaintiff,

v.

Edward A. HINTZ, Defendant.

No. 58 Cr 656.

United States District Court
N. D. Illinois, E. D.

April 5, 1961.

Robert Tieken, U. S. Atty., Chicago, Ill., for plaintiff.

John M. Leonard, Jr., Williams & Leonard, Chicago, Ill., for defendant.

MINER, District Judge.

Edward A. Hintz was indicted on October 31, 1958, for violation of Section 192 of Title 2 of the United States Code Annotated (Revised Statutes Section 102, as amended by 52 Stat. 942), which provides:

"Every person who having been summoned as a witness by the authority of either House of Congress to give testimony or to produce papers upon any matter under inquiry before either House, or any joint committee established by a joint or concurrent resolution of the two Houses of Congress, or any committee of either House of Congress, willfully makes default, or who, having appeared, refuses to answer any question pertinent to the question under inquiry, shall be deemed guilty of a misdemeanor, punishable by a fine of not more than $1,000 nor less than $100 and imprisonment in a common jail for not less than one month nor more than twelve months."

The indictment charged, in substance, that the Committee on Banking and Currency of the United States Senate had been conducting hearings pursuant to Public Law 601, 79th Congress, Sections 102(1) (d) (Rule XXV(1) (d) of the Standing Rules of the Senate) and 134 (a) (60 Stat. 815, 831), 2 U.S.C.A. § 190b (a), and pursuant to Senate Resolution 155, 84th Cong., 2d Session; that the defendant had been duly summoned to testify before the Committee at its hearing on October 9, 1956, in Chicago, Illinois; that the defendant had come before the Committee, where he was duly directed to be sworn and to testify; that the defendant had refused so to be sworn and to testify; and that the defendant thereby willfully had made default in violation of the statute.

Defendant subsequently moved to dismiss the indictment, presenting several important legal issues. Both parties filed detailed, comprehensive briefs on all questions raised by the motion. This memorandum will deal with two of those questions.

I.

The defendant complains that there is a fatal inconsistency in the charge of the indictment. He points to the allegation that he had "come before" the Committee pursuant to summons, and then to the conclusory charge that he "wilfully did make default." He next points to the allegation that he refused "to be sworn and to testify," and the supposed failure of the indictment to allege that he refused "to answer any question pertinent to the question under inquiry." Finally, he views the "wilful default" and "refusal to answer" branches of the statute as defining completely discrete and distinct offenses, and contends that activity coming under one must *ipso facto* be deemed non-violative of the other. In substance, the defendant interprets Section 192 as proscribing only conduct falling within one of two categories: (1) wilful disregard of summons, which defendant says is all that is meant by the statutory phrase "wilfully makes default," and (2) refusal, after having appeared, to answer questions which concern the substance of the subject under investigation, which defendant says is all that is meant by the statutory phrase "pertinent to the question under inquiry."

■ This Court is unable to adopt the propositions so urged, predicated as they are upon a misapprehension of both the purpose and the provisions of Section 192. The "default" which, when wilful, violates the statute, refers to a failure "to give testimony or to produce papers" upon a matter under inquiry before the Congress or its Committee. Such default

can as well occur by refusal to testify as by refusal to appear. The statute proscribes every wilful failure to comply with summons, not merely the failure to appear pursuant to summons.

This interpretation of the provisions of the so-called "first branch" of Section 192 accords with its purpose as expressed by Mr. Chief Justice Vinson in United States v. Bryan, 1950, 339 U.S. 323, 329–330, 70 S.Ct. 724, 729, 94 L.Ed. 884, rehearing denied 339 U.S. 991, 70 S.Ct. 1018, 94 L.Ed. 1391:

> "It is clear that R.S. § 102 is designed to punish the obstruction of inquiries in which the Houses of Congress or their committees are engaged. If it is shown that such an inquiry is, in fact, obstructed by the intentional withholding of documents, it is unimportant whether the subpoenaed person proclaims his refusal to respond before the full committee, sends a telegram to the chairman, or simply stays away from the hearing on the return day. His statements or actions are merely evidence from which a jury might infer an intent to default. A proclaimed refusal to respond, as in this case, makes that intent plain. But it would hardly be less plain if the witness embarked on a voyage to Europe on the day before his scheduled appearance before the committee.

> "Of course a witness may always change his mind. A default does not mature until the return date of the subpoena, whatever the previous manifestations of intent to default. But when the Government introduced evidence in this case that respondent had been validly served with a lawful subpoena directing her to produce records within her custody and control, and that on the day set out in the subpoena she intentionally failed to comply, it made out a *prima facie* case of wilful default."

 The allegation in the indictment that defendant refused to be sworn and to testify is sufficient to charge, not only that he made wilful default, but also that, having appeared, he refused to answer questions pertinent to the question under inquiry.[1] See United States v. Josephson, 2 Cir., 1947, 165 F.2d 82, certiorari denied 333 U.S. 838, 68 S.Ct. 609, 92 L.Ed. 1122, rehearing denied 333 U.S. 858, 68 S.Ct. 731, 92 L.Ed. 1138; Eisler v. United States, 1948, 83 U.S.App. D.C. 315, 170 F.2d 273, certiorari granted 335 U.S. 857, 69 S.Ct. 130, 93 L.Ed. 404, certiorari dismissed 338 U.S. 883, 70 S.Ct. 181, 94 L.Ed. 542. Indeed, the mere charge of refusing to be sworn sufficiently charges a violation of the so-called "second branch" of the statute. There is no question more pertinent to a subject under investigation than the question whether the witness before the tribunal will answer truthfully.

The defendant is mistaken in his view that, having appeared before the committee pursuant to a subpoena requiring that he appear and testify, he could be charged only for refusing to answer pertinent questions rather than for wilful default. He further errs when he urges that his refusal to be sworn and to testify is not sufficient to charge a refusal to answer pertinent questions.

### II.

Defendant further attacked the indictment by asserting that the circumstances under which he was being asked to testify were such that any attempt to punish him for his refusal would constitute an unlawful interference with his "legal"

---

1. Congressional inquiries must, of course, be related to proper legislative purposes, and witnesses may be directed to answer only if the questions are pertinent to such inquiries. Barenblatt v. United States, 1959, 360 U.S. 109, 79 S.Ct. 1081, 3 L.Ed.2d 1115, rehearing denied 361 U.S. 854, 80 S.Ct. 40, 4 L.Ed.2d 93; Watkins v. United States, 1957, 354 U.S. 178, 77 S.Ct. 1173, 1 L.Ed.2d 1273; Quinn v. United States, 1955, 349 U.S. 155, 75 S.Ct. 668, 99 L.Ed. 964; McGrain v. Daugherty, 1927, 273 U.S. 135, 47 S.Ct. 319, 71 L.Ed. 580.

and "moral" rights. In substance, he contends that such refusal cannot be contumacious when it is made in the presence of, and purports to be predicated upon an inability to testify accurately when he is the subject for television and radio broadcasting apparatus, newsreel cameras and photographers.

Ordinarily, this type of attack is phrased in terms of avoidance and may be properly raised only during the trial as a defense or in mitigation. However, defendant has raised the issue in his attack on the legal sufficiency of the indictment, and it is this attack with which the Court is here concerned.

All counsel agree that television, radio, newsreel and other equipment were present and operating in the hearing room when defendant was asked to testify. Counsel only disagree concerning the existence, nature and extent of the discomfiture which a witness may feel while being subjected to the scrutiny of the public as well as the Congress. The issue, therefore, which this Court decides, is whether a contempt of Congress is divested of its criminal character by the mere presence of mass communication media in the vicinity of the witness whose silence the statute condemns.

In support of his position, the defendant has cited United States v. Kleinman, D.C.D.C.1952, 107 F.Supp. 407, and an Illinois statute (Ill.Rev.Stats., 1957, chapter 51, § 57).

The Kleinman decision does not support plaintiff's contentions on the issue now before this Court. The Court there was considering the merits of a contempt of Congress charge, and not the sufficiency of the charging document. Indeed, the fact that District Judge Schweinhaut disposed of the Kleinman case on its merits necessarily implies a belief, if not a judicial determination, that the indictments were sufficient to charge the crime even though "there were, in close proximity to the witness, television cameras, newsreel cameras, news photographers with their concomitant flashbulbs, radio microphones, a large and crowded hearing room with spectators standing along the walls, etc." 107 F.Supp. 408. If Kleinman is authority at all on the question whether a reluctant witness may or may not cite the presence of communications mechanisms as complete justification for his contempt of Congress and in bar of any prosecution, it is authority for the principle that he may not.

■ The language in Kleinman [2] can, of course, be read as approving a single pervasive principle of exclusion—one which prevents conviction of any witness who commits contempt of Congress while in the presence of spectators and the sensory apparatus which permit the nation to see and to hear. To the extent that the learned Court in Kleinman may, in fact, have been advancing such an exclusionary principle, this Court disapproves its reasoning and declines to accept the case as authority. This is not solely because the statement of such a rule was unnecessary to the disposition made of the merits in Kleinman and is but *obiter dictum*. The principal reason for the rejection of such a rule is that neither statute nor Constitution nor internal rule of Congress requires exclusion of the public from the view of Congressional committee proceedings as a condition precedent to the application and enforcement of Section 192.[3]

2. "It is said that these defendants are hardened criminals who are not and could not have been affected by the paraphernalia and atmosphere to which they were exposed. That may be so, but the Court cannot take judicial notice that it is so. Moreover, it cannot be said that for John, who is a good man, one rule applies, but for Jack, who is not a good man, another rule applies. Such reasoning is incompatible with our theory of justice" (107 F.Supp. at page 408).

3. On the contrary, the Legislative Reorganization Act of 1946 requires that "All hearings conducted by standing committees or their subcommittees shall be open to the public, except executive sessions for marking up bills or for voting or where the committee by a majority vote orders an executive session" (Chap. 753,

It is true that Canon 35 of the American Bar Association Canons of Judicial Ethics [4] has received overwhelming judicial approval, and that communications media machinery are barred from most court rooms in the United States. But what the courts may do in order to further the search for justice between litigants has no relevance to what Congress may believe will further its search for information.

There is a valid judicial purpose in excluding from a courtroom all factors which may disturb or distract the witnesses from their primary goal. But the purpose of the Canon and its "exclusionary" principle is completely unrelated to any need or desire to protect litigants or witnesses from the widespread dissemination of testimony. The press, without the supplementation afforded by other media, has already proved itself quite adequate and valuable to the function of disseminating reports of testimony. Even the strictest application of Canon 35 would not require that the galaxy of press reporters or "spectators standing along the walls" who invariably attend an important or sensational court trial should be excluded.

Once we have confirmed the right of the public to the presence of the press over the desire of a witness to protect his sensibilities, it is impossible to accept as valid a rationale which excludes other media because of personal sensitivity. The pencil and pad have the capability of drawing a fine and accurate picture of the proceedings in words and caricatures. The camera and the microphone do not render the proceedings more public; they render the picture more precise. The difference in the effect on a witness' emotional sensibilities through the press re-

Title I, § 133(f), 60 Stat. 831; 2 U.S.C. § 190a(f)). This provision was incorporated in the standing rules of the House of Representatives on January 3, 1953, as Rule XI, Clause 5(g), Rules and Manual of the House of Representatives (U.S. Government Printing Office, 1957), page 366.

See, also, Rule 3 of the Senate Commerce Committee: "Public Hearings of the full committee, or any subcommittee thereof, shall be televised or broadcast only when authorized by the Chairman and the ranking minority member of the full committee."

4. The Canon reads as follows:
"Proceedings in court should be conducted with fitting dignity and decorum. The taking of photographs in the court room during sessions of the court or recesses between sessions, and the broadcasting or televising of court proceedings are calculated to detract from the essential dignity of the proceedings, distract the witness in giving his testimony, degrade the court, and create misconceptions with respect thereto in the mind of the public and should not be permitted.

"Provided that this restriction shall not apply to the broadcasting or televising, under the supervision of the court, of such portions of naturalization proceedings (other than the interrogation of applicants) as are designed and carried out exclusively as a ceremony for the purpose of publicly demonstrating in an impressive manner the essential dignity and the serious nature of naturalization."

See: Howard, A Newspaper Editor Looks at Canon 35, 37 J.Am.Jud.Soc. 166 (1954); McCoy, The Judge and Courtroom Publicity, 37 J.Am.Jud.Soc. 167 (1954); Brownell, Press Photographers and the Courtroom—Canon 35 and Freedom of the Press, 35 Neb.L.Rev. 1 (1955); Swindler, Commentary on Press Photographers and the Courtroom, 35 Neb.L.Rev. 13 (1955); Boldt, Should Canon 35 be Amended? A Federal Judge Answers No, 41 A.B.A.J. 55 (1955); Hanson, Canon 35–Press, Radio and Television Coverage of the Courts, 16 Ala.Lawyer 248 (1955); Miller, Should Canon 35 be Amended? A Question of Fair Trial and Free Information, 42 A.B.A.J. 834 (1956); Wiggins, Should Canon 35 be Amended? A Newspaperman Speaks for the News Media, 42 A.B.A.J. 838 (1956); Tinkham, Should Canon 35 be Amended? A Question of Proper Judicial Administration, 42 A.B.A.J. 843 (1956); Seals, TV—A Pressing Problem, 19 Texas B.J. 72 (1956); McCandless, The Case Against Canon 35, 45 Ill.Bar J. 544 (1957); Cedarquist, The Case for Canon 35, 45 Ill.Bar J. 698 (1957); Taylor, Broadcasting in the Courtroom, 60 W.Va.L. Rev. 312 (1958); Barco, "The Free Press" and "A Fair Trial", 31 Pa.Bar Ass'n Quarterly 63 (1959); Douglas, The Public Trial and The Free Press, 46 A.B.A.J. 841 (Aug. 1960).

port or through sight and sound recording and transmission is not a difference of kind. At most the difference is in the immediacy and the extent of the effect.

The purpose for admitting the one in the courtroom while excluding the other, relates solely to the character of judicial proceedings, our concept of the function of the courts, and our conclusions concerning the methods by which best to perform judicial functions and promote the quest for justice. Even so, there is agitation among the bar for abolition or modification of the ban in judicial proceedings.[5]

The sensitivity of a witness is much less a proper factor in legislative hearings. There are no litigants in a congressional hearing. The issues in a congressional investigation have no particular relevance to the liberty or property rights of witnesses. Indeed, there is a valid legislative purpose in informing and educating the public to the end that they may exercise an informed judgment and render all possible aid to Congress in the investigations and deliberations which are the essence of the legislative function. There is, undeniably, a valid legislative purpose in admitting to the conference room the eyes and the ears of the nation.[6]

In judicial proceedings there are private rights of litigants which the court is zealous to protect. In legislative inquiries, there are no such rights directly in issue. So long as there is no encroachment upon constitutional rights, the public right and duty of the legislature to investigate supersedes any incidental private embarrassment. And the same rule applies when Congress implements its investigations by disseminating its findings, by informing the people on the necessity for, alternatives to, provisions, efficacy and probabilities for enactment of proposed or pending legislation, and by soliciting the aid of an informed public. See Barenblatt v. United States, 1959, 360 U.S. 109, 126–127, 134, 79 S.Ct. 1081, 3 L.Ed.2d 1115, rehearing denied 361 U.S. 854, 80 S.Ct. 40, 4 L.Ed.2d 93; Watkins v. United States, 1957, 354 U.S. 178, 215, 77 S.Ct. 1173, 1 L.Ed.2d 1273.

It is possible that constitutional rights can be denied through abuse of either the exclusionary principle of the courts or the admissibility rule adopted by Congress. Abuses may have actually occurred in the past and may occur in the future. What makes us secure in sustaining the right of the judiciary to exclude, and the legislature to admit, is a confidence that our courts will not permit encroachments on constitutional rights.

■ ■ Ruling on how congressional hearings shall be conducted is the task of the Congress.[7] The courts have no right to dictate either the procedures for Congress to follow in performing its functions, or the composition and conduct of the persons and paraphernalia admitted by Congress to its hearings. This court has no power to impose upon Congress, a coordinate branch of our government, either a proscription against or a prescription for radio, television, movies or photographs. This court is of the opinion that the mere presence of such mechanisms at an investigative hearing

---

5. It is currently being contended that with the elimination of flash, hot lights and noisy equipment, the old objections to broadcasting no longer have vitality, and that broadcasting, photographing and televising such proceedings will afford the public a needed familiarity with the administration of justice. A special committee of the American Bar Association is presently reappraising the problem. See Lyman, Courts, Communications and Canon 35, 46 A.B.A.J. 1295 (December, 1960).

6. Even Canon 35 sanctions the broadcasting, photographing or televising of certain court ceremonials which register a salutary impact on the public. No objections have been raised to the transmission of judicial conferences, judicial inaugurals, and other non-litigative ceremonials.

7. The regulation of telecasts, broadcasts and photographs of hearings before the House of Representatives and its Committees is discussed briefly in Congressional Record, Feb. 23, 1961, pages 2440–2444.

does not infect the proceeding with impropriety. It is only when appeal is made for judicial action in a particular case that the courts can appraise the legislative procedures and conduct which it is alleged have been unlawfully employed. Watkins v. United States, 1957, 354 U.S. 178, 205, 77 S.Ct. 1173, 1 L.Ed.2d 1273.

Kleinman sustained refusals to answer congressional inquiries because of the presence of the public, the press and the other media—their number, distance, lighting, dimensions of room, demeanor. The learned Judge held that "the concentration of all of these elements seems to me necessarily so to disturb and distract any witness to the point that he might say today something that next week he will realize was erroneous." 107 F.Supp. at page 408.

■ The question for the fact-finder in a contempt-for-refusal-to-answer case, where the defense condemns the conditions under which the defendant was commanded to answer, is whether or not the conditions were reasonably conducive to that clarity and accuracy of response of which that defendant would normally have been capable. See United States v. Orman, 3 Cir., 1953, 207 F.2d 148, 159. Kleinman is correct to the extent that it properly defined the issue to be decided. This court does not agree with Kleinman, however, in its view that this issue can be decided without competent evidence of the actual effect of the conditions on the individual asserting their impropriety.

Kleinman first found that ordinary men would be so adversely affected by the physical conditions under which the defendants there had been called upon to speak, that they could not speak with ordinary clarity and accuracy. It then proceeded to "presume" that the defendants were so affected, notwithstanding that defendants had not offered proof of the actual effect of the physical conditions upon them. This presumption, the court reasoned, was applicable because the government failed to present evidence to the contrary. And, anyway, said the court, such evidence would have been incom-

petent because "it cannot be said that for John, who is a good man, one rule applies, but for Jack, who is not a good man, another rule applies" (107 F.Supp. at page 408).

■■ To follow the Kleinman rationale is to effect a basic departure from criminal law procedural principles which have long been considered settled. The government's initial burden is to present proof of every essential element of the crime charged. United States v. Hoyland, 7 Cir., 1959, 264 F.2d 346, certiorari denied 361 U.S. 845, 80 S.Ct. 98, 4 L.Ed.2d 83. The accused carries the burden of going forward by proving facts which relate to him personally, especially when those facts are relied upon by him as justifying or excusing an otherwise criminal act. McPhaul v. United States, 1960, 364 U.S. 372, 379, 81 S.Ct. 138, 5 L.Ed.2d 136; Taylor v. United States, 8 Cir., 1927, 19 F.2d 813; Williams v. United States, 5 Cir., 1948, 170 F.2d 319, 322, certiorari denied 335 U.S. 909, 69 S.Ct. 412, 93 L.Ed. 442; Jencks v. United States, 5 Cir., 1955, 226 F.2d 540, reversed on other grounds 1957, 353 U.S. 657, 77 S.Ct. 1007, 1 L.Ed.2d 1103. The prosecution always has the burden of proving guilt beyond a reasonable doubt and this burden never shifts (Leland v. State of Oregon, 343 U.S. 790, 72 S.Ct. 1002, 96 L.Ed. 1302, rehearing denied 344 U.S. 848, 73 S.Ct. 4, 97 L.Ed. 659; United States v. Indian Trailer Corp., 7 Cir., 1955, 226 F.2d 595; United States v. Fenwick, 7 Cir., 1949, 177 F.2d 488; United States v. Morley, 7 Cir., 1938, 99 F.2d 683, certiorari denied 306 U.S. 631, 59 S.Ct. 463, 83 L.Ed. 1033; Duncan v. United States, 7 Cir., 1927, 23 F.2d 3), but its task in response to an alleged defense is to answer, not to anticipate, a defendant's proof.

■ In a prosecution for violation of 2 U.S.C.A. § 192, the government makes out a prima facie case of wilful default by introducing evidence that defendant "* * * had been validly served with a lawful subpoena * * * and that on the day set out in the subpoena [defendant] intentionally

failed to comply * * * " United States v. Bryan, 1950, 339 U.S. 323, 330, 70 S.Ct. 724, 730, 94 L.Ed. 884. The government need not, initially, adduce evidence to negative the defense that the conditions set by Congress at the time of inquiry rendered defendant unable to speak with such accuracy and clarity as reasonably approximates that of which he would normally have been capable. This latter principle has been adopted by the Supreme Court for application in prosecutions under 2 U.S.C.A. § 192, in the following words (United States v. Fleischman, 1950, 339 U.S. 349, 360–362, 70 S.Ct. 739, 745, 94 L.Ed. 906):

" * * * Granting that these or other excuses for nonaction may exist, must the Government negative each, or was the burden on respondent to advance them as defensive matter?

"We think that the circumstances of this case fairly bring into play the familiar doctrine in criminal cases that 'it is not incumbent on the prosecution to adduce positive evidence to support a negative averment the truth of which is fairly indicated by established circumstances and which if untrue could be readily disproved by the production of documents or other evidence probably within the defendant's possession or control.' Rossi v. United States, 1933, 289 U.S. 89, 91–92, 53 S.Ct. 532, 77 L.Ed. 1051, and authorities cited. The considerations that govern this question have been well stated by Mr. Justice Cardozo in discussing a similar question—the constitutionality of a statute which shifted the burden of proof in a criminal prosecution to the defendant. He said:

" 'The decisions are manifold that within limits of reason and fairness the burden of proof may be lifted from the state in criminal prosecutions and cast on a defendant. The limits are in substance these, that the state shall have proved enough to make it just for the defendant to be required to repel what has been proved with excuse or explanation, or at least that upon a balancing of convenience or of the opportunities for knowledge the shifting of the burden will be found to be an aid to the accuser without subjecting the accused to hardship or oppression.

* * * * * *

" ' * * * For a transfer of the burden, experience must teach that the evidence held to be inculpatory has at least a sinister significance * * *, or if this at times be lacking there must be in any event a manifest disparity in convenience of proof and opportunity for knowledge, as, for instance, where a general prohibition is applicable to everyone who is unable to bring himself within the range of an exception. Greenleaf, Evidence, Vol. 1, § 79. The list is not exhaustive. Other instances may have arisen or may develop in the future where the balance of convenience can be redressed without oppression to the defendant through the same procedural expedient. The decisive considerations are too variable, too much distinctions of degree, too dependent in last analysis upon a common sense estimate of fairness or of facilities of proof, to be crowded into a formula. One can do no more than adumbrate them; sharper definition must await the specific case as it arises. Morrison v. People of State of California, 1934, 291 U.S. 82, 88–91, 54 S.Ct. 281, 78 L.Ed. 664.'

"In this situation, manifestly, the prosecution is under a serious practical handicap if it must prove that negative proposition—that respondent did not or had no good reason for failing to try to comply with the subpoena insofar as she was able. The possibilities of time and circumstances are of such wide range as to defy inclusive rebuttal. On the other hand, the burden of the affirmative was not an oppressive one for respondent to undertake; the relevant

facts are peculiarly within her knowledge. * * *"

■ It is not sufficient for a defendant in these cases merely to describe the setting for the congressional inquiry. Just as no court can proscribe Congressional inquiries merely because they are alleged to involve the area of freedom of speech or improper impelling motives (Barenblatt v. United States, 1959, 360 U.S. 109, 125–134, 79 S.Ct. 1081, 3 L.Ed. 2d 1115, rehearing denied 361 U.S. 854, 80 S.Ct. 40, 4 L.Ed.2d 93), no court can look at a setting and *ipso facto* determine that a witness properly refused to comply with a subpoena to testify. On the contrary, there is a presumption that Congress, having ventured to act pursuant to its constitutional authority and in furtherance of its investigative functions, has properly exercised that authority and properly performed those functions. This presumption is not rebutted by anything less than competent proof that (1) defendant was actually deprived of his normal faculties to respond intelligently with clarity and accuracy, (2) this deprivation was the reasonable result of conditions caused, or affirmatively allowed to exist, by Congress, and (3) such conditions were unreasonable and unwarranted.

■ The principle that one who is ordered by proper authority to speak may remain silent if he is able to bring himself within the area of insulation from such commands, is not new, nor is it unique to this kind of case. For many years our courts have required that when a witness claims a right to remain silent in reliance on the privilege against self-accusation assured by the Fifth Amendment, and that claim is contested before a court, he must demonstrate that the answer can, indeed, support a conviction or furnish a link in the chain of evidence needed to convict. Mason v. United States, 1917, 244 U.S. 362, 37 S.Ct. 621, 61 L.Ed. 1198; Blau v. United States, 1950, 340 U.S. 159, 71 S.Ct. 223, 95 L.Ed. 170.[8]

In the Mason case, the Supreme Court confirmed the rule that the witness who asserts the privilege against self-incrimination must have and prove that he "* * * had reasonable cause to apprehend danger to himself from a direct answer to any question propounded * * *" (244 U.S. at page 367, 37 S.Ct. at page 623). Proof must be presented by the witness as to the effect any such answer may or would have upon *him*, not as to the effect such answer may or would have upon someone else or even upon some hypothetical "ordinary" man. Nor is it sufficient for him merely to assert, without such proof, that there may or would be such effect, for:

"The general rule under which the trial judge must determine each claim according to its own particular circumstances, we think, is indicated with adequate certainty in the above cited opinions. Ordinarily, he is in much better position to appreciate the essential facts than an appellate court can hold and he must be permitted to exercise some discretion, fructified by common sense, when dealing with this necessarily difficult subject. Unless there has been a distinct denial of a right guaranteed, we ought not to interfere.

"In the present case the witnesses certainly were not relieved from answering merely because they declared that so to do might incriminate them. * * *" 244 U.S. at pages 366–367, 37 S.Ct. at page 623.[9]

8. Also, with respect to assertions that communications are privileged, it is incumbent on the claimant to prove his right to the benefits of the privilege. Crosby v. Pacific S.S. Lines, 9 Cir., 1943, 133 F.2d 470, 475, certiorari denied 319 U.S. 752, 63 S.Ct. 1166, 87 L.Ed. 1706. See also, Ranger, Inc. v. Equitable Life Assurance Society of United States, 6 Cir., 1952, 196 F.2d 968.

9. It is, of course, accepted principle that where there is provided appropriate immunity from the effects of his testimony, a witness may not refuse to speak. See Reina v. United States, 1960, 364 U.S. 507, 81 S.Ct. 260, 5 L.Ed.2d 249.

 ██ Mr. Hintz has no greater right than the courts to prescribe the conditions under which he may be interrogated by Congress. Whether a congressional committee hearing shall be public or private, and who shall be admitted or invited, are questions committed to the Congress by the very basic constitutional separation of powers principle. The courts may not deny legal sufficiency to a contempt of Congress indictment merely because the admitted factual context includes the presence of photographic and aural recording and transmission apparatus. The defendant has full opportunity to assert the presence and prove the effect on him of such apparatus in his defense to the charge at the trial.

 There is but one limitation to this right of the defendant to assert the non-wilfulness of his refusals to answer questions relevant to a proper legislative purpose. This concerns the matter of the oath. It is the opinion of the court that no conditions within the hearing room, no impropriety in the convening of the inquiring committee or in the means by which a witness has been summoned, and no irrelevancy of the questions anticipated or known to follow, can warrant a refusal to take the oath or express an affirmation. It is, in short, no defense to a contempt of Congress prosecution for refusal to swear or affirm, that the witness would not or could not answer the questions of substance to follow.

 The defendant's contention concerning Ill.Rev.Stats.1957, Chapter 51, § 57, may be quickly disposed of. This statute reads:

"No witness shall be compelled to testify in any proceeding conducted by a court, commission, administrative agency or other tribunal in this state if any portion of his testimony is to be broadcast or televised or if motion pictures are to be taken of him while he is testifying."

The statute may be sufficient to proscribe any State of Illinois proceeding brought to punish a refusal to testify at a state or municipal legislative hearing that was broadcast, televised or filmed.[10] The statute does not, however, purport to apply to federal proceedings. Indeed, any interpretation to the contrary would render the statute unconstitutional in its purported application to federal proceedings. In re Tarble's Case, 1871, 13 Wall. 397, 80 U.S. 397, 20 L.Ed. 597; State of Tennessee v. Davis, 1879, 100 U.S. 257, 25 L.Ed. 648; Bank of United States v. Halstead, 1825, 10 Wheat. 51, 23 U.S. 51, 6 L.Ed. 264; McCulloch v. State of Maryland, 1819, 4 Wheat. 316, 17 U.S. 316, 4 L.Ed. 579. See also, Weston v. City Council of Charleston, 1829, 2 Pet. 449, 465, 27 U.S. 449, 465, 7 L.Ed. 481; Bank of Commerce v. New York City, 1862, 2 Black 620, 632–633, 67 U.S. 620, 632–633, 17 L.Ed. 451; Township of Pine Grove v. Talcott, 1873, 19 Wall. 666, 675, 86 U.S. 666, 675, 22 L.Ed. 227; Claflin v. Houseman, 1876, 93 U.S. 130, 136, 23 L.Ed. 833; Kansas City Southern Ry. Co. v. Kaw Valley Drainage Dist., 1913, 233 U.S. 75, 78, 34 S.Ct. 564, 58 L.Ed. 857; Commonwealth of Massachusetts v. Mellon, 1922, 262 U.S. 447, 485–486, 43 S.Ct. 597, 67 L.Ed. 1078; Sanitary District of Chicago v. United States, 1925, 266 U.S. 405, 426, 45 S.Ct. 176, 69 L.Ed. 352; State of Florida v. Mellon, 1927, 273 U.S. 12, 18, 47 S.Ct. 265, 71 L.Ed. 511; Parker v. Brown, 1943, 317 U.S. 341, 347, 359, 360, 63 S.Ct. 307, 87 L.Ed. 315; Allied Stores of Ohio, Inc. v. Bowers, 1959, 358 U.S. 522, 526, 79 S.Ct. 437, 3 L.Ed. 2d 480; Cf. City of New York v. Miln, 1837, 11 Pet. 102, 36 U.S. 102, 9 L.Ed. 648.

10. While this court is aware of the important legal issues raised by this legislative directive in its application to court proceedings, we do not here intend to pass upon the power of the Illinois legislature to prescribe how judicial proceedings shall be conducted.